## Wytheville.

JONES, INFANT, BY, &c., v. OLD DOMINION COTTON MILLS.

JUNE 24th, 1886.

1. PRACTICE AT COMMON LAW—*Demurrer to evidence.*—It is the settled rule that by demurring to the evidence the demurrant waives all evidence on his part that conflicts with that of the other party, admits the credit of the evidence demurred to, admits all inferences of fact that may be fairly deduced from the evidence, and refers it to the court to deduce all fair inferences from the evidence. *Trout* v. *Va. & Tenn. R. R. Co.*, 23 Gratt. 637.

2. IDEM—*Declaration—Negligent injury.*—A declaration need not state whether plaintiff was an employee or a mere trespasser, but is sufficient, if it state when, where, in what manner, and under what circumstances plaintiff was injured by the default, negligence, and improper conduct of defendant's servant, who was then and there in care and management of certain described machinery of defendant.

3. APPELLATE COURTS—*Two verdicts—Judgment.*—The usual practice of appellate courts is to consider entire record and pass on errors as committed, and, generally, to reverse judgments for any material error, not waived, without looking to subsequent proceedings. And where a right verdict is set aside, they will restore it and enter judgment on it, and reverse subsequent judgment *inconsistent* with previous right verdict. But where subsequent judgment is *consistent* with previous right verdict, it will be affirmed. Yet, where plaintiff was entitled to judgment on first verdict set aside on defendant's motion, and first and last verdicts arrive at same result, the only difference being that the last finds a larger amount of damages for injury for which defendant is in damages responsible, plaintiff is entitled to judgment on last verdict.

4. IDEM—*Case at bar.*—Where two verdicts are rendered in succession, giving plaintiff damages for injury received by him through negli-

gence of defendant, and each, in turn, is set aside on defendant's motion, and a third verdict is rendered, giving plaintiff a larger amount of damages, subject, however, to a demurrer to the evidence, which is erroneously decided by court below against plaintiff, he is entitled to judgment on last verdict.

5. PRINCIPALS—*Employees—Negligent injuries—Liability—General rule—Exceptions.*—The general rule is well settled that the principal is not liable to one employee for an injury resulting from the negligence for a co-employee. But exceptions to this rule are equally well settled. These are (1), where the injury is occasioned by exposing the employee to risks not within his contract of employment; (2), where the negligent employee, whatever his grade or title, exercises supervision or control over the injured employee, principal must answer for the negligent acts of the former whereby the latter is injured without fault on his part; (3), where principal undertakes to run dangerous machinery with insufficient help, whereby the employee is injured, the principal is liable.

6. IDEM—*Case at bar.*—The plaintiff, a boy of thirteen years of age and little experience with machinery, is hired by his father, "to sweep, carry water, and fill the buckets with quills," in the weaving department of the defendant company's cotton mills, the machinery whereof was then being run with insufficient help, and is placed by an employee then representing the defendant company, to do work to do which he had not been hired, and he is thereby injured—

HELD:

>  The defendant company is liable in damages to the plaintiff for the injury.

Argued at Richmond but decided at Wytheville.

Error to judgment of hustings court of city of Manchester, rendered 11th February, 1884, in an action of trespass on the case wherein Robert L. Jones, an infant, suing by his next friend, Thomas W. Jones, was plaintiff, and the Old Dominion Cotton Mills was defendant.

The object of the suit was to recover damages occasioned the plaintiff by the alleged negligence of the defendant's agent. There were three jury trials. The first jury returned a verdict for the plaintiff, in April, 1882, for $2,251.25 damages. This

'verdict was set aside and a new trial awarded by the court on the motion of the defendant, on the ground that it was contrary to the law and the evidence. The second jury, in June, 1882, returned a verdict in favor of the plaintiff for $4,500 damages. This verdict was also set aside by the court and a new trial granted on the motion of the defendant, for the like reason. To the action of the court setting aside these two verdicts, respectively, the plaintiff excepted, and filed his bills of exception, setting forth the evidence. The third jury, in February, 1884, returned a verdict for the plaintiff, and assessed his damages at $7,000, subject to the opinion of the court on the demurrer to evidence filed by the defendant. The court below, on consideration, sustained the demurrer to evidence and gave judgment for the defendant; to which judgment the plaintiff excepted, and thereupon obtained from one of the judges of this court a writ of error and *supersedeas*.

Opinion states the facts.

*Meredith & Cocke* and *W. W. Cosby*, for plaintiff in error.

*W. W. Gordon* and *Friend & Davis*, for defendant in error.

RICHARDSON, J., delivered the opinion of the court.

Applying the settled rule that "by demurring to the evidence the demurrant waives all evidence on his part that conflicts with that of the other party, admits the credit of the evidence demurred to, admits all inferences of fact that may be fairly deduced from the evidence, and refers it to the court to deduce the fair inferences from the evidence," as laid down by this court in *Trout* v. *Va. & Tenn. R. R. Co.*, 23 Gratt. 637, we proceed to state and examine the following facts of the case:

On the 28th of October, 1880, and for some years before, the defendant company was the owner of a cotton mill in Manchester, and in the fall of 1879, by its agent, Alexander Thomas, first boss of the weaving department, employed the plaintiff, then a boy of twelve years, "to sweep the floor, carry water and fill the buckets with quills." At the time of his employment, and on the day the injury complained of was received, the weaving department consisted of three rooms, all under the general management of the first boss, Thomas. In each of these rooms was a second boss, or overseer, their general duties being to see that the hands in their rooms were not idle, and to repair and keep in order the machinery running in their respective rooms; yet on occasions their power was more extended—that is to say, when a second boss of one room came for a legitimate purpose into another room and found the second boss of that room, and also the first boss, absent, it was expected of him in such absence to put in order any machinery then needing repairs, and on such occasions he would be in authority in that room.

The two rooms in this weaving department, necessary now to be spoken of, were on the third and fourth floors of the mill, respectively. In the room on the third floor one Waymack was second boss, and in the room on the fourth floor one Eastwood was second boss, his room being immediately over that of Waymack. In Waymack's room, near the ceiling, ran iron rods, commonly called lines of shafting, on which were iron wheels, called pulleys. The motive power which ran the looms in both Waymack's and Eastwood's rooms was derived from the same said lines of shafting—that is, the looms in Waymack's room were run by leather belts running from pulleys on said shafting down to other pulleys on the looms in that room; and the looms in Eastwood's room were run by belts running from certain pulleys on said shafting up through the floor of his room to pulleys on the looms of his room.

Besides the female operatives working the looms, it was necessary, in order to run the weaving department properly, to have in the three rooms composing that department, seven male hands—that is, the first boss, and in each room a second boss and helper, or boy, like the plaintiff. On the 28th day of October, 1880, the day of the injury complained of, it was attempted to run that department with not more than four such hands—that is, with Waymack, one second boss, absent, with the helper, or boy, in Eastwood's room, absent, and with Phillips, second boss in the third room, absent. Waymack had been granted leave of absence to visit the agricultural fair. So, on the day of the accident, Thomas, first boss, had not only to perform his regular duties of superintending all these rooms, but had also to act as second boss in two rooms— one on the first, and the other on the third floor. A more fitting occasion could seldom arise for Eastwood's authority to be more extended than usual. He was the only second boss on hand to assist the first boss, Thomas.

The accident occurred thus: One of the belts, which ran a loom in Eastwood's room, broke and fell down into Waymack's room through the hole in the floor. As was his duty, Eastwood went down into Waymack's room to get his belt; he pushed it up, went back to his own room, dropped the end of it through the hole in the floor, ran a chisel across the hole and let the belt hang down suspended across the chisel. As was necessary, he then again went down into Waymack's room to fasten the two ends of the belt together. He picked up a step-ladder near the door of entrance to Waymack's room and went on with it towards the middle of the room, where he had to fix the belt. When within thirty or forty feet of the place, he saw Thomas, first boss, go out of the room. It did not occur to him to call Thomas, and it is doubtful whether Thomas, owing to the great noise of the looms in motion, could have

Opinion.

heard the call had it been made. When he got to the belt, Eastwood put the step-ladder down, put one end of the swinging belt over its pulley, riveted together its ends, and called the plaintiff to come to him. After a few unimportant words with plaintiff, Eastwood ordered plaintiff to "stand on this step," meaning the second step of the ladder and hold up the swinging belt whilst he, Eastwood, went up stairs and flattened the rivet. He left plaintiff standing on said second step. It was necessary to have some one to hold up the belt in order to keep it from wrapping around the shafting and doing damage. The step-ladder was "a shackling one"; it was placed just under the line of shafting, on which was the pulley on which Eastwood's belt ran. Four looms were about the base of the ladder, two on each side of it. The four belts on these looms ran obliquely up to this same line of shafting. Two of the belts that ran across the front of the ladder, converged more and more closely together until they reached the pulley on which they both ran. The other two belts that ran across the back of the ladder, converged in the same way until they reached the pulley on which they ran. The two pulleys on which these four belts ran were about two feet apart, and between them was the pulley on which Eastwood's belt ran. The four belts thus converging would, of course, bring them all closer to a person the higher he was up the ladder. The plaintiff's position, on the second step of the ladder, brought his arms in close proximity to two of the converging belts, for he was ordered to stand on the ladder and hold the swinging belt wide apart, so that the side over the pulley would not wrap over it. The position in which the plaintiff was placed was one of extreme danger, especially for a boy of thirteen years, with no experience and no warning of the danger. The danger to this boy, holding one belt likely to jerk him into the shafting and surrounded by four converging belts, was

increased by the fact that the belts were not laced together with a strip of leather, but were riveted with metal hooks, which increased the danger of his being caught in the belts.

When Eastwood went back to his room to fasten the rivet, before drawing the belt up, he had scarcely reached it when he heard a heavy thud against the floor, and dust flew in his face. Fearing an accident had happened, he ran back to Waymack's room and found plaintiff caught up in this iron shafting with three belts wrapped around him and two girls pulling on his hanging feet, to keep him from further injury. Eastwood partly stopped the machinery, cut away the belts and took plaintiff down. It was found that having been violently jerked up against the floor and wrapt about the revolving pulleys, he was greatly bruised and injured, and his right arm horribly lacerated—all the muscles and sinews of the under part of the arm torn and destroyed. The arm was not amputated, but was rendered permanently useless.

The plaintiff, when employed, had been placed in Waymack's room, but was not given orders to obey Waymack only. On several prior occasions he had done work for Eastwood at his command. On the day of the accident he was working as helper in both rooms, in the absence of the regular helper in Eastwood's room. When he was ordered by Eastwood to help about the belt, neither Thomas nor Waymack was present. Eastwood had repaired machinery in Waymack's room that morning. On other occasions, when Waymack was absent, Eastwood had been sent to Waymack's room by first boss, Thomas, to take charge of it. The mill had no printed rules. Eastwood, when fixing the belt, was doing an act within the scope of his duty or employment. He needed, and was entitled to, assistance, as the fixing of the belt required two, and he was empowered to call for assistance. Had Waymack been present, it would have been his duty to render

the necessary aid.  Had Thomas, the first boss, been there, it
would have been his duty to assist.  Eastwood also had the
right to call on his own helper or boy.  In the absence from
the room of both Thomas and Waymack, Eastwood, under
the circumstances, and in the course of his employment, had
authority over the plaintiff, who was in the room, who was
ordered to assist, and who, though but an inexperienced boy,
was placed by Eastwood in a position of extreme peril; and
in thus obeying Eastwood, received the injury which disabled
him for life.  For this act Eastwood was not discharged, nor
even reprimanded, although he communicated the fact to his
first boss, Thomas, who had employed him, ten minutes after
the occurrence.  On the morning after the accident Eastwood's
act was approved of and ratified by Robertson, the superin-
tendent of the mill, who ran the entire business, established
rules, prescribed duties, and could discharge any employee.
He told Eastwood he had only done his duty.

As already stated, the court below held that the case thus
made by the evidence was not sufficient in law to entitle the
plaintiff to a judgment in accordance with the last verdict.  It
is then for this court to pass on that judgment; but, before
doing so, let us look to the plaintiff's declaration, which con-
tains two counts, to each of which, as well as to the declaration
as a whole, the defendant demurred.

It is insisted for the appellant that the court below should
have sustained the demurrer to the first count, and it is neces-
sary that this question be here examined into, as a writ of error
brings up the whole record, and though the judgment below
were on a demurrer to evidence, advantage may be taken of a
fatal defect in the declaration.  *Bank of the U. S.* v. *Smith*, 11
Wheat. 171.

Was there such defect?  It is undoubtedly true, as said by
Green, J., in *Dykes* v. *Woodhouse*, 3 Rand. 300, that "the plain-

tiff's declaration must state enough to show, if true, and not avoided by the plea, that the defendant is necessarily liable to the plaintiff's demand." It is also true that where "the declaration amounted to an averment simply—that the plaintiff's intestate was injured by the negligence of the defendants in the operation of their business in using and employing their engines and cars on their railways," without stating "the manner in which the plaintiff was injured," so that "it was impossible for the defendant to learn from it the ground upon which the plaintiff was proceeding," as was the case with the second count of the plaintiff's declaration in *B. & O. R. R. Co.* v. *Whittington,* 30 Gratt. 805—such declaration is insufficient.

But, on examining the declaration in the case in hand, we do not find either count open to the objection that it fails to set forth fully the facts which constitute the cause of action, so that they may be understood by the party who is called on to answer them, by the jury to ascertain the truth of the allegations, and by the court to pass judgment. 1 Chitty Pldg. 256.

The first count, it is true, does not state whether the plaintiff was an employee or a mere trespasser, but it certainly does state, and distinctly set forth, when, where, in what manner, and under what circumstances—giving ample details—the plaintiff was injured by the default, negligence, and improper conduct of the defendant's servant, who was then and there in the care and management of certain described machinery of the defendant. This is all that seems necessary to fulfill the office of a declaration. It is noteworthy that this count accurately corresponds, in its material features, with the declaration in the similar case of *N. & P. R. R. Co.* v. *Ormsby,* 27 Gratt. 700.

No particular fault is attributed to the second count, nor do we find any in it. Therefore, we are of opinion that the hust-

ings court did not err in overruling the demurrer to the declaration.

Now, as to the several verdicts and judgments in this case, it may be said that it is the usual practice of appellate courts to consider the whole record and to pass upon errors in the order in which they were committed, and generally to reverse the judgment for any material error, not waived, whereby the party appealing may have been aggrieved, without looking into the subsequent proceedings; and in adopting and applying this rule, such courts act upon grounds of right, reason, good sense and substantial justice, as well as of economy of time and labor, in reference to the facts of the case they are dealing with. Thus, in *Briscoe* v. *Clarke,* 1 Rand. 215, at the first trial there was a verdict for the defendant, which, on the plaintiff's motion, was set aside. At the second trial there was a verdict and judgment for the defendant, and the plaintiff appealed. This court held that the first verdict had been improperly set aside, and without noticing any other error, affirmed the judgment in favor of the defendant.

In *Pleasant* v. *Clements,* 2 Leigh, 474, the verdict at the first trial was for the plaintiff, and was set aside, on the motion of the defendant. At the second trial the verdict was in favor of the defendant and judgment accordingly, and the plaintiff appealed. This court held that the first verdict had been improperly set aside, and entered judgment thereon in favor of the plaintiff, reversing the judgment appealed from without examination.

In *Taylor* v. *Taylor*, 21 Gratt. 700, at the first trial the verdict was for the plaintiff, and was set aside on the defendant's motion; and at the second trial, a jury being waived, and the whole case submitted to the court, judgment was entered for the defendant. On appeal, this court said: "There having been two trials in the circuit court, this court will look to the

record of the proceedings in both trials, and if the court erred in setting aside the verdict of the jury, that is an error for which this court, without considering the subsequent proceedings in the case, will reverse the judgment rendered for the defendant upon the second trial, and enter final judgment in favor of the plaintiff upon the verdict of the jury in the first trial," and cited the cases above referred to.   But in that case (*Taylor* v. *Taylor*) the court found that the verdict at the first trial had not been improperly set aside, and held that the judgment in favor of the defendant at the second trial was not erroneous, and affirmed it.   So it had no occasion to apply the rule it had laid down.

In *Brown* v. *Rice*, 76 Va. 629, the verdict at the first trial was in favor of the plaintiff for part of the debt demanded, and on his motion the verdict was set aside.   At the second trial there was a verdict for the plaintiff for the whole debt demanded, and the defendant appealed.   This court held that the verdict at the first trial, in favor of the plaintiff for *part* of the debt demanded, was right, and should not have been set aside, and held that all proceedings subsequent to said verdict were erroneous, and set the same aside and entered judgment on the first verdict, as the court below should have done.

And, lastly, in *Tracy* v. *Barksdale*, 33 Gratt. 342, at the first trial there was a verdict for the defendant, which was set aside on the plaintiff's motion.   At the second trial there was a verdict for the defendant, and judgment accordingly.   This court held that the first verdict had been erroneously set aside, and without enquiring into the proceedings at the second trial, affirmed the judgment in favor of the defendant.

It may be observed that in none of the other cases did this court give any reasons for the rule thereto applied, but in the case last mentioned, Moncure, P., speaking for the whole court, said: "This court being of opinion that the circuit court erred

in setting aside the first verdict rendered by the jury in favor of the defendant, and in not overruling the plaintiff's motion to set aside that verdict, and not rendering a judgment in conformity with that verdict; and this court being further of opinion that the said circuit court, in deciding and rendering judgment in favor of the defendant on the second trial, arrived *at the same result* as if it had decided and rendered judgment in favor of the defendant on the first trial; it is, therefore, unnecessary to enquire now if the said court erred in rendering the judgment which it did render on the second verdict, considered without reference to the action of the court on the first verdict; but without doing so, it is sufficient and only necessary for this court to affirm the judgment of the circuit court, to which the writ of error was awarded in this case, which is, therefore, accordingly done." The meaning of all which is, that the defendant was entitled to judgment on the first verdict, and, as the judgment given for him on the second verdict, arrived at the same and the proper result, the court approved the judgment.

By comparing the particulars of the several cases, above referred to, it is easy to comprehend the principle upon which, in such cases, appellate courts act, though it may be difficult, if not impossible, to formulate a rule for universal application. It is obvious, however, that where a right verdict is set aside, the appellate court will restore it and enter judgment thereon, and will, consequently, reverse, without special examination into the proceedings, a subsequent judgment that is inconsistent with the previous right verdict. But where the subsequent judgment is not inconsistent with the previous right verdict, the court will, without noticing any later error, merely affirm the subsequent judgment, as this court did in the case of *Briscoe* v. *Clarke* and *Tracy* v. *Barksdale, supra.* The princi-

ple is applied to subserve the ends of justice, and not in mere servile obedience to any arbitrary technical rule.

So applying this principle to the case at bar, it follows that if the plaintiff in error was entitled to a judgment on the first verdict, which was improperly set aside on the defendant's motion, he is entitled to a judgment on the last verdict, as they both arrived *at the same result*—that is, that he had received an injury for which the defendant was responsible in damages—the only difference being that the amount assessed as damages, in his favor, by the first jury, was less than the amount assessed in his favor by the last jury. In *Brown* v. *Rice, supra,* the verdict at the first trial was for the plaintiff for *part* of his demand. This court held that verdict to be right, and, therefore, it followed, without saying, that the verdict at the second trial, in favor of the plaintiff for *the whole* of his demand, was wrong. Hence, the judgment entered on the last verdict was reversed, and a judgment entered by this court on the first verdict, which this court held to be for the true amount. In that case, however, the question in litigation was the *true amount* of the debt, whilst in this case the question is, primarily, whether or not the defendant is liable at all in damages to the plaintiff for the injury alleged to have been received by him; and, secondarily, if liable, what shall be the amount of the damages? the last being a question exclusively for the jury, and which, by their last verdict, they fixed at $7,000, subject only to the judgment of the hustings court upon the law as to the defendant's liability at all for any amount whatever. The question before the court was not whether the amount of the verdict was proper, but whether any verdict whatever under the law applicable to the case was allowable against the defendant company.

It is quite plain that the facts of the cases above referred to are not the same as, or even similar to, the facts of the case in

hand. Here there were three successive verdicts, all in favor of the plaintiff and differing only as to the amount of the damages. Each verdict was, in its turn, set aside on the motion of the defendant; and two new trials having been granted it—that is, as many as under the statute (Code 1873, ch. 173, sec. 15,) could be granted the same party in the same case, the defendant shrewdly withdrew the decision of the matters in issue from the jury by a demurrer to the evidence, and the hustings court, adhering to its former decisions on the verdicts previously rendered in the cause (so far as the evidence at the several trials was the same), set aside the third and last verdict, and turned the plaintiff out of court with a bill of costs to pay.

Now, if upon the law of the case (or of the several cases as made out by the evidence adduced at the several trials), the plaintiff is entitled to recover damages of the defendant company for the injury received by him as alleged in the declaration, it is pertinent to enquire, "Is it reasonable that the defendant company should be heard to complain of being required to pay the amount of damages assessed by the last jury, a tribunal sought and appealed to by the defendant company on its own motion, and to insist on the application of what, in this instance, would be a mere technical rule under which the defendant company might be enabled, through no fault of the plaintiff, to escape the consequences of its liability for said injury, with the payment of only the less amount of damages assessed by the first jury, and thus, in effect, to make it practicable, as well as profitable, to take advantage of its own wrong ?

By such course, the defendant company would be allowed the benefit of *the chances* that the succeeding juries would find against it either, no damages, or less damages than the first jury found ; and when, as in this case, each successive jury

gives larger damages, then the result would be to allow the defendant, as a choice of evils, to return to the first verdict as least onerous. It is therefore apparent that to apply the rule here, as it was applied in *Briscoe* v. *Clarke,* and other cases, *supra,* would be to offend against every principle of sound reason, good judgment and substantial justice; though doubtless the rule in question was appropriately applied in those cases.

But another obvious reason exists for first considering the questions arising on the demurrer to evidence on the last trial. Notwithstanding this demurrer, it is admitted that the defendant company was entitled to have a decision on its demurrer to the plaintiff's declaration, and got it. But it is manifest that in all other respects, and certainly as respects all questions as to the sufficiency of the evidence, so far as that evidence was the same, and, in the main, it was the same, at the several successive trials; the demurrer filed by the defendant company to the evidence at the last trial merged and consolidated the entire case, and presented to the court for decision the one question, whether or not the plaintiff's evidence, considered in the light of the principles which govern demurrers to evidence, was sufficient to maintain on his part the issue joined.

For these reasons, and passing by the question as to the propriety of the hustings court requiring the plaintiff to join in the demurrer to evidence, we are of opinion that it is proper, first, to consider and decide the main question, "Should the hustings court have sustained the demurrer to the evidence?"

The general rule that the master is not liable to one servant for an injury resulting from the negligence of a fellow servant has been recently so fully considered by this court in the case of *B. & O. R. R. Co.* v. *McKenzie,* 81 Va. 71; in the cases of *N. & W. R. R. Co.* v. *Fergusson,* 79 Va., 241; *R. & D. R. R. Co.* v. *Moore,* and *Moon* v. *R. & A. R. R. Co.,* 78 Va., 93 and 745, and in numerous other cases, that a discussion of

the question is unneccessary, except so far as pertinent to determine its application to the facts of the case here in hand. It is well known that this doctrine was first promulgated in England in 1837, in South Carolina in 1841, and in Massachusetts in 1842, and was generally adopted in this country; but exceptions and modifications have become as well established as the rule itself; and this by many decisions, of which the recent one by the Supreme Court of the United States in *Railway Co.* v. *Ross,* 112 U. S., 377, and that of this court in *Moon* v. *R. & A. R. R. Co.,* *supra,* it may be said, to the extent of engrafting on the rule such limitations and qualifications as best accord with reason and justice.

Several of the exceptions appear to proceed only from close scrutiny and strict construction of the language of the rule. Several, however, are outside the language, but are derived from the reason of the rule. "This rule proceeds on the theory," says Mr. Justice Davis in *Railroad Co.* v. *Fost,* 17 Wall. 553 (a case strikingly like the one under consideration), "that the employee is presumed to take upon himself, in entering the service of the principal, the risks incident to the undertaking, among which are to be counted the neglegence of fellow-servants in the same employment, and that considerations of public policy require the enforcement of the rule. But this presumption cannot arise where the risk is not *within* the contract of service, and the servant had no reason to believe he would have to encounter it."

The risks, then, which the servant actually assumes, are only those arising out of his contract of service or employment. Cooley, J., in *Railway* v. *Bayfield,* 37 Mich. 205, and the cases there cited.

The negligent acts, the risk whereof the servant takes, are those of a fellow-servant in the same common employment, and not of a negligent servant so far occupying, as to the

injured servant, the position of his principal, as to render the latter chargeable for his negligence as a personal fault.. Cooley on Torts, 561. In *Moon* v. *R. & A. R. R. Co., supra,* it is said: "Where a company delegates to an employee the performance of duties which the law makes it incumbent on the company to perform, his acts are the acts of the company, his negligence the negligence of the company." And in that case, as in the case of *Railway Co.* v. *Ross, supra,* the company was held liable for an injury done to a brakeman by the negligence of the conductor of the train. And a foreman having charge of the machinery or its repairs, is in legal effect the master. Pierce on Railroads, 368–9. Where the negligent servant, whatever his grade or title, exercises supervision or control over the injured servant, they are not fellow-servants in a common employment, and the principal must answer for the negligent acts of the former whereby the latter was injured without fault on his part. *Flike* v. *B. & A. R. R. Co.* 53 N. Y. 549; *Railroad Co.* v. *Ross, supra.*

Another well sustained exception to the general rule of the principal's exemption from liability, is where he undertakes to run dangerous machinery with insufficient help. Pierce on Railroads 372, note; *Flike* v. *B. & A. R. R. Co., supra; Booth* v. *B. & A. R. R. Co.,* 73 N. Y. 738; *Snow* v. *Housatonic R. R. Co.,* 8 Allen, 441.

In the case at bar, the plaintiff, a boy of thirteen years of age, with little experience and familiarity with machinery, and hired from his father by the defendant company "to sweep, carry water, and fill the buckets with quills" in the weaving department of its cotton mills, was ordered into the position of danger already described, by one in the employment of the company, and, under the circumstances, on that occasion necessarily representing the company. When the injury occurred to this boy he was not doing the work his father engaged him

to do.   On the contrary, he was, at the.time, employed in a
service outside the contract and wholly disconnected therewith.
To sweep, carry water, and fill buckets with quills, is quite a
different thing from standing on a ladder and holding up a
heavy belt, surrounded by the belts of four looms in danger-
ous proximity to his person, and these belts plying over pulleys
making over a hundred and twenty revolutions per minute.
The one is the work of a boy, and within the compass of a
boy's strength and experience; the other requires the strength,
experience and judgment of a man, and is a man's work, to
say the least.   Thus situated, holding up and aiding to adjust
a displaced belt that ran a loom in the upper room, the plain-
tiff received the injury which makes him a comparatively help-
less cripple for life.   Neither he nor his father, when the
contract of service was made, had any ground to expect that
he would be called on to encounter any such peril.

Eastwood, the second boss, was entrusted with the care, man-
agement and repair of the machinery, in connection with the
repairs of which this shocking accident occurred.   He needed
help to mend a broken belt and readjust displaced machinery.
There was no one present in the room when the adjustment
was to be effected except this boy, the plaintiff in error.
Eastwood, by the usage of this company's employees, was not
only empowered, but, in the nature of things, had authority to
call to his assistance this boy, who never for a moment doubted
his authority or hesitated to obey.   In mending the belt, and
readjusting the machinery, Eastwood was performing a plain
duty he owed his principal, and was acting within the scope of
his employment.   Only four of the seven male hands ordina-
rily required to run the machinery of the weaving department
were on duty that day, the others being absent on leave.   In
attempting to run the machinery with an insufficient number
of hands, Eastwood was compelled, in the course of his regu-

lar duty, to call for help.   He called this boy, and ordered him into a position of danger, the result of which was irreparable injury to him.    In so doing, Eastwood was the representative of his principal, and his order, his negligent want of proper care and caution, was the negligent order and want of proper care of Eastwood's principal; and liability for the consequences cannot be avoided by the contention that Eastwood had no authority and should not have given the order.    The defenddant company is liable on the plain principle of *respondeat superior*, Eastwood being then and there its *alter ego*.    Wharton's Law of Neg. sec. 232; *Malone* v. *Hathaway*, 64 N. Y. 642.

The company is also liable on the ground that by the act of its agent it exposed the boy to perils outside the ordinary risks incident to his contract of service.    *R. R. Co.* v. *Fost, supra; Labor* v. *R. R. Co.*, 52 Ill. 401.

It is likewise liable on the ground that by the attempt to run the dangerous machinery of the weaving department with an insufficient number of hands the occasion arose which contributed to produce, if it did not directly cause, the injury to this boy employee.    Pierce on Railroads, 369; *Booth* v. *B. & A. R. R. Co.*, 73 N. Y. 38.

It is needless to prolong the discussion.    We are clearly of opinion that the hustings court erred in sustaining the defendant's demurrer to the evidence, and that its said judgment must be reversed and judgment entered here for the plaintiff.

In the view thus taken of the demurrer to the evidence it is unnecessary to look to other questions raised in the record.

LACY, J., dissented.

JUDGMENT REVERSED.