## JOHN M. DONOVAN *vs.* THE "WILLIS A. HOLDEN."

### February 26, 1904.

*Admiralty.—Non-liability of Ship for Injuries to Sailor Due to His Fellow Servants and the Perils of the Sea:* The libellant was seriously injured while asssisting in lowering the foresail of the schooner while on a voyage on the high seas; the injury being due partly to the negligence of others of the crew and partly to the perils of the sea, the vessel was not liable in damages, it not appearing that she was unseaworthy or that the rigging or appliances were out of order, or that the officers and crew or any of them were incompetent.

*Same.—Liability of Ship for Medical Treatment of One of its Crew Injured in its Service:* Upon the arrival of the vessel in port, the master neglected to procure for libellant proper medical treatment, leaving him to seek the same at his own expense. *Held,* that the vessel was liable in damages to libellant for such neglect.

· In Admiralty: Libel *in rem* for Damages for Personal Injuries.

J. J. Dunne, Proctor for Libellant.
Robertson & Wilder, Proctors for Libellee.

DOLE, J.   This is a libel *in rem* for damages to the libellant on account of injuries received by him while assisting in the navigation of the schooner "Willis A. Holden," the libellee, due, as he alleges, to the carelessness and negligence of the said schooner and her master and owners, and for damages on account of the neglect of the said schooner and her master and owners to supply him, upon the arrival of the said schooner in port, with proper surgical treatment.

The first division of the claim for damages raises a legal question as to the liability of the vessel for injuries received by the libellant while in its service under the circumstances shown by the evidence.

In 1884, the Supreme Court of the United States, in the case of the *Chicago and Milwaukee Railroad v. Ross,* 112 U. S. 377, in reference to the responsibility of the owners for injuries sustained by the plaintiff, who was engineer of a freight train, through a collision with another freight train, decided that the conductor of a railway train, who commands its movements, directs when it shall start, at what stations it shall stop, at what speed it shall run and has the general management of it, personally represents the company and therefore, that for injuries resulting from his negligent acts, the company is responsible.

It appeared that it was the duty of the conductor of the train, "under the regulations of the company to show to the engineer "all orders which he received with respect to the movements of "the train. The regulations in this respect were as follows: " 'Conductors must in all cases when running by telegraph and " 'special orders, show the same to the engineer of their train " 'before leaving stations where the orders are received. The " 'engineer must read and understand the order before leaving

" 'the station.   The conductor will have charge and control of
" 'the train and of all persons employed on it, and is responsible
" 'for its movements while on the road except when his direc-
" 'tions conflict with these regulations or involve any risk or
" 'hazard, in which case, the engineer will also be held respon-
" 'sible.' "

At the time in question, the conductor having received orders
from the train dispatcher, neglected to deliver them to the plain-
tiff and after the train started he went into the caboose and
there fell asleep; in consequence of the ignorance of the en-
gineer,—the plaintiff, of these orders, the collision occurred by
which the plaintiff received severe and permanent injuries.

This decision was influential for a while upon the question
as to whether a person in charge of a railroad train, as the con-
ductor, or in charge of a ship, as the master, represented the
owners to such an extent that in case of injuries resulting from
his negligence, his owners were responsible therefor, making a
modification of the old rule that employes suffering from the
negligence of a co-employe have no remedy against the em-
ployer, they having assumed, in entering into the engagement
to the employer, such risks as might arise from the negligence
of their co-employes.

In 1893, the Supreme Court of the United States, in the
case of the *Baltimore and Ohio Railroad Company v. Baugh,*
149 U. S. 368, modified the law in the Ross case and laid down
the principles upon which liability of the owners exists in such
cases, and in its decision adopted the statement of the law in
the case of *Atchison, Topeka, etc., Railroad v. Moore,* 29 Kan.
632, as follows:

"A master assumes the duty towards his servant of exercising
reasonable care and diligence to provide the servant with a
reasonably safe place at which to work, with reasonably safe
machinery, tools and implements to work with, with reasonably
safe materials to work upon, and with suitable and competent
fellow-servants to work with him; and when the master has

properly discharged these duties, then, at common law, the servant assumes all the risks and hazards incident to or attendant upon the exercise of the particular employment or the performance of the particular work, including those risks and hazards resulting from the possible negligence and carelessness of his fellow-servants and co-employes. And at common law, whenever the master delegates to any officer, servant, agent, or employe, high or low, the performance of any of the duties above mentioned, which really devolve upon the master himself, then such officer, servant, agent or employe stands in the place of the master, and becomes a substitute for the master, a vice-principal, and the master is liable for his acts or his negligence to the same extent as though the master himself had performed the acts or was guilty of the negligence. But at common law, where the master himself has performed his duty, the master is not liable to any one of his servants for the acts or negligence of any mere fellow-servant or co-employe of such servant, where the fellow-servant or co-employe does not sustain this representative relation to the master."

The word *master* in this citation is evidently used as representing the owner or employer. This case was followed by a number of others adopting the principle laid down above, and the Ross case, upon the point mentioned, has gradually ceased to be an authority. See also *N. E. R. R. Co. v. Conroy,* 175 U. S. 328, (1899); *Wilson v. Merry,* L. R. 1 H. L. Sc. 326; *The Osceola,* 189 U. S. 175, (1903).

It appears from the evidence in the case before the court, that the libellant, who was the second mate of the schooner "Willis A. Holden," was a seaman of good character and good seamanship, as is shown by his certificate of discharge; and that on a voyage of the schooner from Newcastle to the Hawaiian Islands, about September 24th of last year, it became necessary to lower the foresail on account of a slight damage to the rigging, and when it was about half way down, the libellant coming up from supper, was called upon to assist a seaman who was taking in

the slack of the down-haul,—a rope coming from the peak of the foresail to the deck; that the ship was rolling a good deal, causing the gaff to swing violently so that a part of the down-haul at one moment would be lying loosely on the deck and the next moment would be taut. In proceeding to help the sailor, who was taking in the slack of the down-haul, the libellant came across the loose coils of the down-haul lying on the deck and as the gaff swung the other way, tightening this rope, it became entangled with libellant's feet, lifting him into the air for ten feet or more, lacerating one foot to the bone and dropping him on the deck, causing minor injuries to different parts of his body. From that time until the schooner reached the Island of Maui, about October 5th, libellant was disabled and helpless, lying in his bunk and suffering great pain.

It is contended by counsel for the libellant that this injury was caused by the neglect of the master of the schooner or by the first mate acting for him, in that although there were three men of the other watch in the forecastle at the time of the accident, who might, and ought to have been called upon for assistance in lowering this sail, yet there was no effort made to obtain their assistance. He contends that there should have been two men at least taking in the down-haul from the time they commenced to lower the foresail, and that one man could not take it in fast enough to keep it taut and to prevent the rope from time to time lying loosely on the deck and so creating the danger to which libellant was exposed.

It appears to me that besides the negligence charged, there was negligence on the part of the mate who had charge of this operation, in permitting the men lowering the sail by the throat and peak halliards to lower it so fast that the one man taking in the down-haul was not able to take it in fast enough to keep it substantially taut. Admitting that there was negligence in both of these ways, the question arises, were the owners of the schooner responsible for this negligence of the mate and perhaps, indirectly, of the master? Or were the owners free from liability on the ground that the master and mate and crew

were fellow-servants, and that negligence of fellow-servants is one of the risks assumed by sailors in engaging as such on board a vessel?

The point was made by counsel for the libellant, that negligence by the captain or by the mate, they being of a different rank of employes from that of the sailors, takes this case out of the rule of non-liability of owners for injuries caused employes by co-employes.

I find that this is not the law. In the case of *The City of Alexandria,* 17 Fed. Rep., 392, an authority much quoted, is the following conclusion of law on this point:

"It constitutes no exception to the rule that the several persons employed are not in equal stations or authority, or that one servant is injured through the negligence of another, who is his superior in station, to whom he owes obedience."

We now come to the question whether the injury in this case was due to the neglect of the employer to provide a reasonably safe place in which to work, which in this case would refer to the seaworthiness of the vessel; with reasonably safe appliances to work with, which would refer to the tackle, sails, apparel and furniture of the vessel; and with suitable and competent fellow-servants with whom to work. There is no evidence and no allegation in this case that the ship was unseaworthy; that the rigging or furniture of the ship was out of order; or that the officers or crew, or any of them, were incompetent. The counsel for the libellant claims and refers to numerous authorities in support thereof, that the fact of the imminent danger that the libellant was exposed to and which resulted in his very serious injuries, was a breach of the duty of the owners to provide a safe place in which to work. I have carefully looked over his authorities and do not find any which are analagous to the case before this court, which support this contention. The two cases coming nearest are *Railway Company v. Lavalley,* 36 Ohio, 221, and *Mather v. Rillston,* 156 U. S. 391.

In the first of these cases, plaintiff was injured while underneath a car standing on the track, engaged in repairing it, by the

car being struck by other cars and moved along a short distance. The court held that under the rule requiring the employer to provide a safe place in which to work, it was liable, there being no regulations for the prevention of such accidents, and the foreman in charge of the work being a representative of the employer in regard to such duty, had not taken precautions to prevent the car from being moved while the plaintiff was working underneath it, or to warn him of the danger in time for him to make his escape.

The second case was decided on the same principles of law as were adopted in the first, with a special reference to the nature of the enterprise conducted by the defendant as a dangerous one.

These cases are clearly distinguishable from the one before the court, in that the employers required of the employes as a part of their regular employment, work in surroundings which were in their very nature most dangerous; and that the obvious precautions which would have conformed to the rule of furnishing the servant a reasonably safe place in which to work, were neglected; whereas in the case before the court, the ship with its rigging and running gear was, so far as the evidence goes, in good order and the place where the plaintiff met his injury, became unsafe for the moment only because of the negligence of his fellow-employes whose duty it was to handle and adjust the appliances by which the work was to be done, to-wit, the running gear by which the sail was lowered.

"The rule which requires the master to provide a safe place and safe appliances for the servant, is applied when the place in which the work is to be done is furnished or prepared by the master, as in the case of a ship or a mill or a factory, or when the machinery or other appliances with which the servant is employed to work, are furnished by the master." *Callan v. Bull,* 113 Cal., 603 (1896).

"The rule does not apply to a case where several persons are employed to do certain work and by the contract of employment, either express or implied, the employes are to adjust the

appliances by which the work is to be done." *Burns v. Sennett & Miller,* 99 Cal., 368, (1893), quoted with approval in *Callan v. Bull, supra.*

In the case of *The A. Healon,* 43 Fed. Rep., 592, decided in 1890, cited by counsel for the libellant, the petitioner was injured while assisting in furling the mainsail, by the gasket, with which he was working, giving way, in consequence whereof he fell to the deck receiving severe injuries. The primary cause of the accident was the rotten condition of the gasket of which the master of the vessel had been notified by the mate. There being no evidence that the owners sent the vessel to sea with the gasket in that condition or were negligent in the selection of a master or otherwise, the case did not come under rule of law requiring the employer to furnish the employe with reasonably safe appliances to work with. The case was decided in favor of the petitioner under the authority of the Ross case, which as has been shown above, has been substantially modified by later decisions.

I am, however, of the opinion that in such a case where the appliances for navigating the vessel are in good condition at the beginning of the voyage, but yet become unfit and dangerous through wear and tear and exposure in a long voyage, the master is the representative of the owners in the duty of keeping them in fit and safe condition for use, and that the owners are liable for injuries arising from his neglect of such duty. This conclusion is, however, not applicable to the case before the court.

The case of *Clowes v. The Frank and Willie,* 45 Fed Rep., 494, decided in 1891, cited by libellant's counsel, was probably influenced by the law of the Ross case though that case is not referred to in the opinion. The petitioner was injured by the fall of a pile of lumber upon him while assisting in the unloading of the libellee vessel. The attention of the mate, who was directing the work, was called to the dangerous method adopted of discharging the lumber, and he was expostulated with without effect. The petitioner was given damages on the

ground that the mate was the "representative of the ship and "owners in the supervision of the work."

The decision in this case is not in line with the law on this point as established by recent cases.

The occupation of navigating ships is not regarded as one of "great and unusual danger," and in this case there is no evidence that the appliances furnished by the owners for the management of the vessel were not in a reasonably safe condition for the work.

I find that the vessel and the owners are not liable in damages for the injuries received by libellant in the accident referred to, which injuries were due to the negligence of his fellow-servants and partially, perhaps, to the dangers of the sea.

The second branch of this case consists of a claim for damages on account of the failure of the schooner, her master and owners, to supply libellant with proper surgical treatment at the end of the voyage.

In the case of *The City of Alexandria, supra,* is the following :

"Misconduct or neglect by the officers in the treatment of the seaman, after he has been wounded in the service of the ship, becomes a different and additional cause of action against the ship, because a legal obligation to him then arises to afford suitable care and nursing, and if this be neglected, the ship may be held to consequential damages."

See also *Brown v. Overton, Sprague's Decisions,* 462.

A seaman injured in the service of his vessel, even though the injury be the result of ordinary negligence on his part, is entitled to be taken care of at the expense of the vessel until the end of the voyage and longer if necessary to effect a cure, so far as the same can be done by the use of the ordinary medical means.

*The City of Alexandria, supra,* 396; *Peterson v. The Chandos,* 4 Fed. Rep., 645.

The schooner arrived at Kahului about October 4th or 5th for Custom House entry, and immediately went to Kaanapali, Maui, her port of destination, arriving there October 6th.

4—U. S. D.

There is no complaint by libellant as to the care and attention he received on the voyage, the captain affording him such medical treatment as his knowledge and the resources of the ship permitted. The libellant admits in the libel, that upon the arrival of the schooner at Kaanapali a physician, believed by him to be a quarantine officer, came aboard and looked at his foot and bathed it with warm water and covered it with a piece of cotton which he directed to be kept moist with a solution which he furnished; and that on the 8th and 9th of October he again came aboard and repeated the same treatment; but libellant received no further medical attention aboard said schooner.

This substantially agrees with the evidence of the master who, although confusing the proper names of Kahului and Kaanapali, testified that upon the arrival at one of these places,—probably Kaanapali, he asked the government doctor who came aboard to examine the crew, to examine libellant's foot. He says: "He did so and dressed it with the means I "had aboard the vessel and the next day called and dressed it "with his own appliances. He said at the time that the foot "was in a very good condition and that he thought it would get "'along all right." He further says that the doctor treated libellant's foot on three occasions, the 7th, 8th, and 10th of October; also sent medicine to the ship on the 13th by him,—the master.

The libellant was discharged on the 13th of October. He says that he was not sent to any hospital but that he asked the captain for a permit to go to a hospital and that the captain told him that he would send him by the next boat, and "when "the next boat came he said the boat after the next boat, and "so on." The captain says on this point: "I offered at the "time of paying off to have a boat leaving Kaanapali call along "side of the ship and get Mr. Donovan aboard if necessary. "I made that statement before the United States Commissioner "and I supposed that Mr. Donovan agreed to the same. The

"next I saw of the man, he was in my boat ready to go ashore."

It appears that the libellant left the ship immediately upon his discharge, going ashore at Kaanapali and from there going to Lahaina in a carriage. At Lahaina he consulted a physician —Dr. Molony, and paid six dollars for his services; he states that these services consisted in dressing his foot, and that he reached the Queen's Hospital in Honolulu on the 17th of October and remained there until the 24th of November. Dr. Walters,—a practicing physician of Honolulu, testified that he was an X-Ray expert and explained the radiograph of the libellant's injured foot, which was taken in his office by himself. He further testified that three and possibly four bones of the foot were fractured and that there had not been a bony union of the fracture, and, giving a technical description of the existing state of the injury, said that the condition of the foot might remain as it is at present many months and that the injury was a permanent one unless there should be operative interference, by which I understand that he meant an operation might cause a cure, which cure, he says, would be doubtful on account of the numerous adhesions of the tendons; that a possibility of restoration of the use of the foot "would depend en-"tirely upon the result of the operation. There is a union of "the tendons at the present time and it is impossible to tell the "exact extent of that union in the present condition of the foot. "An operation might be perfectly successful.    I understand "that the injury occurred some months ago and the ossification "is more or less false."

Dr. Mays, a practicing physician of Honolulu, testified that he had examined libellant's foot about the first of November, and stated that he had examined the radiograph exhibited; that he "did not look very favorably on his prospects of recovery "and even if he recovered sufficiently to have a useful foot, he "would not be able to do any work requiring him to be on his "feet much."    He corroborated Dr. Walters' testimony as to three fractures and as to the nature of the union of the bones as

being callous and fibrous rather than osseous. He further said, "I should say the injury was permanent; I do not expect he "will ever have a very useful foot." He spoke doubtfully about the benefit of an operation.

It appears from the evidence that there was a period of about eleven days from the time of the arrival of the schooner at Kaanapali until the libellant reached the Queen's Hospital, and about twenty-five days before he had an examination of his foot by Dr. Mays. The evidence does not show whether or not this delay may have prejudiced his chances of recovery but it was the duty of the ship to have obtained for him, without unnecessary delay, surgical attention and a chance to have such treatment as might be necessary to a possible cure. I find that this duty was neglected by the master. The examination by the quarantine physician was no fulfillment of this duty; he made no diagnosis of the case but merely gave such treatment as would tend to alleviate his unfortunate condition. The ship should have made immediate arrangements to have sent libellant to a hospital with instructions for a thorough diagnosis and such treatment as might, in the opinion of skillful physicians, be necessary to a probable cure, which treatment should include an operation, if that was considered necessary, and the fact that no attempt was made to do this shows a complete failure on the part of the ship to fulfill its obligation to libellant who was so seriously injured in its service. By this neglect a legal claim for damages has arisen against the vessel in favor of the libellant. An uncertainty of beneficial results from an operation does not affect this obligation, except, perhaps, as to the amount of damages. According to Dr. Walters such an operation might be perfectly successful, which I understand to mean that the diseased condition of the foot might be fully cured although it might not be restored to its original state of usefulness.

Under the circumstances of this case, I feel that the libellant should recover damages in the amount of eight hundred dollars, with costs. A decree will be signed accordingly against the vessel.