# CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY v. ROSS.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Argued April 14, 1884.—Decided December 8, 1884.

A railroad corporation is responsible to its train servants and employés for injuries received by them in consequence of neglect of duty by a train conductor in charge of the train, with the right to command its movements, and control the persons employed upon it.

A conductor of a railroad train, who has the right to command the movements of the train and to control the persons employed upon it, represents the company while performing those duties, and does not bear the relation of fellow-servant to the engineer and other employés of the corporation on the train.

This was an action brought by a locomotive engineer, in the employ of the plaintiff in error, defendant below, to recover damages for injuries received in a collision which was caused by the negligence of the conductor of the train. The facts and circumstances connected with the injury are set forth in the opinion of the court. At the trial below, several questions arose whose determination by the court below was assigned as error and which were argued here. For the purposes of the opinion it is only necessary to notice the two following portions of the charge to the jury, each of which was excepted to:

(1) " It is very clear, I think, that if the company sees fit to place one of its employés under the control and direction of another, that then the two are not fellow-servants engaged in the same common employment, within the meaning of the rule of law of which I am speaking." ·

(2) " By this general order, gentlemen, as I understand and construe it, the company made the engineer, in an important sense, subordinate to the conductor."

The order referred to in the second clause was as follows : " Conductors must, in all cases, while running by telegraph or special orders, show the same to the engineers of their trains before leaving stations where the orders are received. The engineer must read and understand the order before leaving the station."

Judgment for plaintiff, to reverse which the defendant, as plaintiff in error, sued out this writ.

*Mr. John W. Cary* for plaintiff in error.—The court erred in charging the jury that the plaintiff and the conductor were not fellow-servants or co-employés engaged in the same general business. This charge was prior to the decision of this court in *Randall* v. *Baltimore & Ohio Railroad*, 109 U. S. 478, and is in direct conflict with it. That was an action by a brakeman for an injury received through the alleged negligence of the engineer of another train of the same company. . The court say : " Nor is it necessary, for the purposes of this case, to undertake to lay down a precise and exhaustive definition of the general rule in this respect, or to weigh the conflicting views which have prevailed in the courts of the several States ; · because persons standing in such a relation to one another as did this plaintiff and the engineman of the other train, are · fellow-servants, according to the very great preponderance of judicial authority in this country, as well as the uniform course of decision in the House of Lords, and in the English and Irish courts. . . They are employed and paid by the same master. The duties of the two bring them to work at the same place at the same time, so that the negligence of one in doing his work may injure the other in doing his work. Their separate

services have an immediate common object, the moving of trains." The rule now established in England, and generally in this country, is, that the term "fellow-servant" includes all who serve the same master, work under the same control, derive authority and compensation from the same source, and are engaged in the same general business, though it may be in different grades and departments of it. *Wonder* v. *Baltimore & Ohio Railroad Co.*, 32 Maryland, 411; *Wilson* v. *Merry*, L. R. 1 H. L. Sc. 326; *Columbus & Indianapolis Railroad* v. *Arnold*, 31 Ind. 174; *Warner* v. *Erie Railway Co.*, 39 N. Y. 468; *Hard* v. *Vt. & Canada Railroad*, 32 Vt. 473, 480. The fact that the injured servant was subordinate to the negligent servant, and under his control, makes no difference. Wharton, Law of Negligence, § 229; Wood, Master and Servant, § 437; Cooley on Torts, 543–4; Sherman & Redfield on Negligence, § 100. It is true that the States of Ohio and Kentucky seem not to have followed this rule; but the general current of authorities, both in this country and in England, is as above stated. We cite the following from the great mass of authorities on the subject: *Laning* v. *N. Y. C. R. R. Co.*, 49 N. Y. 521, 528; *Malone* v. *Hathaway*, 64 N. Y. 5, 8; *Crispin* v. *Babbitt*, 81 N. Y. 516; *Lawler* v. *Androscoggin R. R. Co.*, 62 Me. 463; *Blake* v. *Maine Central R. R. Co.*, 70 Me. 60; *Lehigh Valley Coal Co.* v. *Jones*, 86 Penn. St. 432; *Brown* v. *Winona & St. Peter R. R. Co.*, 27 Minn. 162; *Peterson* v. *Coal & Mining Co.*, 50 Iowa, 673; *Wilson* v. *Merry*, above cited. The cases of *Slater* v. *Jewell*, 85 N. Y. 61; *Robertson* v. *Terre Haute*, &c., *Railroad*, 78 Ind. 77; and *Chicago, St. L. & N. O. Railroad* v. *Doyle*, 8 Am. & Eng. R. R. Cases, 171, are especially in point. See also *Mich. Cent. R. R.* v. *Smithson*, 45 Mich. 212; *Clark* v. *St. Paul & Sioux City R. R.*, 28 Minn. 128; *Ladd* v. *New Bedford R. R.*, 119 Mass. 412; and *Naylor* v. *Chicago & N. W. Railroad*, 53 Wisc. 661. In the latter case the court say: "Hence, if the servant, knowing the hazards of his employment as the business is conducted, is injured while employed in such business, he cannot maintain an action against the master for such injury, merely because he may be able to show that there was a

safer mode in which the business might have been conducted, and that had it been conducted in that mode he would not have been injured."

Mr. *Enoch Totten* for defendant in error.

Mr. Justice Field delivered the opinion of the court.

The plaintiff in the court below is a citizen of Minnesota, and by occupation an engineer on a railway train. The defendant in the court below, the plaintiff in error here, is a railway corporation created under the laws of Wisconsin. This action is brought to recover damages for injuries which the plaintiff sustained whilst engineer of a freight train by a collision with a gravel train on the 6th of November, 1880. Both trains belonged to the company, and for some years he had been employed as such engineer on its roads. On that day he was in charge of the engine of a regular freight train which left Minneapolis at a quarter past one in the morning, its regular schedule time, and had the right of the road over gravel trains, except when otherwise ordered. At the time of the collision, one McClintock was the conductor of the train, and had the entire charge of running it. It was his duty under the regulations of the company to show to the engineer all orders which he received with respect to the movements of the train. The regulations in this respect were as follows: " Conductors must in all cases, when running by telegraph and special orders, show the same to the engineer of their train before leaving stations where the orders are received. The engineer must read and understand the order before leaving the station. The conductor will have charge and control of the train, and of all persons employed on it, and is responsible for its movements while on the road, except when his directions conflict with these regulations, or involve any risk or hazard, in which case the engineer will also be held responsible."

When the freight train left Minneapolis on the morning of November 6, 1880, there was coming toward that city from Fort Snelling, by order of the company, over the same road, a gravel train, termed in the complaint a wild train, that is, a

train not running on schedule time any regular trips. The conductor, McClintock, was informed by telegram from the train dispatcher of the coming of this gravel train, and ordered to hold the freight train at South Minneapolis until the gravel train arrived. South Minneapolis is between Minneapolis and the place where the collision occurred. The gravel train had been engaged for a week before in hauling in the night gravel to Minneapolis from a pit near Mendota, for the construction by the company of a new and separate line of railroad between St. Paul and Minneapolis, and the freight train had, during this time, been stopped by the conductor, on orders of the train dispatcher, upon side tracks between Minneapolis and St. Paul Junction, for the passage of the gravel train. But on the night of November 6, 1880, he neglected to deliver to the plaintiff the order he had received, and after the train started he went into the caboose and there fell asleep. The freight train of course did not stop at the station designated, but continuing at a speed of fifteen miles an hour, entered a deep and narrow cut 300 feet in length, through which the road passed at a considerable curve, and on a down grade, when the plaintiff saw on the bank a reflection of the light from the engine of the gravel train, which was approaching from the opposite direction at a speed of five or six miles an hour, and was then within about one hundred feet. He at once whistled for brakes and reversed his engine, but a collision almost immediately followed, destroying the engines, damaging the cars of the two trains, causing the death of one person, and inflicting upon the plaintiff severe and permanent injuries, for which he brings this action.

On the trial the conductor of the gravel train testified that at the time of the collision he was under orders to run to South Minneapolis regardless of the plaintiff's train; that having twelve cars loaded with gravel, his train stalled before reaching the cut where the collision happened; that he then separated his train in the middle, took six cars to Minnehaha Station, went back with the engine for the other six cars, and was coming with them through the cut when the collision occurred; that the gravel train had run in the night about a week, and that when he could reach Minneapolis before the starting time

of plaintiff's train he ran without orders, otherwise upon orders, and had met or passed plaintiff's train at the same place about every night during the week.

It is evident from this brief statement that the conductor on each train was guilty of gross negligence. The conductor of the freight train was not only required by the general duty devolving on him, as one controlling its movements, to give to its engineer such orders as would enable him to avoid collision with other cars, but as we have seen, he was expressly directed by the regulations of the company, when running by telegraph or special orders, to communicate them to him. Had these regulations been complied with, the collision would have been avoided. The conductor of the gravel train allowed it to be so overloaded that its engine was incapable of moving it at one portion of the road before reaching the cut; and when, in consequence, he was obliged to leave half of his cars on the track while he took the others to Minnehaha, he omitted to send forward information of the delay or to put out signals of danger. Having for the week previous, passed the freight train at nearly the same place on the road, he must have known that by the delay there was danger of collision. Ordinary prudence, therefore, would have dictated the sending forward of information of his position or the putting out of danger signals. Had he done either of these things the collision would not have occurred.

The collision having been caused by the gross negligence of the conductors, the question arises whether the company is responsible to the plaintiff for the injuries which that collision inflicted upon him.

The general liability of a railroad company for injuries, caused by the negligence of its servants, to passengers and others not in its service is conceded. It covers all injuries to which they do not contribute. But where injuries befall a servant in its employ, a different principle applies. Having been engaged for the performance of specified services, he takes upon himself the ordinary risks incident thereto. As a consequence, if he suffers by exposure to them, he cannot recover compensation from his employer. The obvious reason for this

exemption is, that he has, or, in law, is supposed to have them in contemplation when he engages in the service, and that his compensation is arranged accordingly. He cannot, in reason, complain if he suffers from a risk which he has voluntarily assumed, and for the assumption of which he is paid. There is also another reason often assigned for this exemption—that of a supposed public policy. It is assumed that the exemption operates as a stimulant to diligence and caution on the part of the servant for his own safety as well as that of his master. Much potency is ascribed to this assumed fact by reference to those cases where diligence and caution on the part of servants constitute the chief protection against accidents. But it may be doubted whether the exemption has the effect thus claimed for it. We have never known parties more willing to subject themselves to dangers of life or limb because, if losing the one, or suffering in the other, damages could be recovered by their representatives or themselves for the loss or injury. The dread of personal injury has always proved sufficient to bring into exercise the vigilance and activity of the servant.

But however this may be, it is indispensable to the employer's exemption from liability to his servant for the consequences of risks thus incurred, that he should himself be free from negligence. He must furnish the servant the means and appliances which the service requires for its efficient and safe performance, unless otherwise stipulated; and if he fail in that respect, and an injury result, he is as liable to the servant as he would be to a stranger. In other words, whilst claiming such exemption he must not himself be guilty of contributory negligence.

When the service to be rendered requires for its performance the employment of several persons, as in the movement of railway trains, there is necessarily incident to the service of each the risk that the others may fail in the vigilance and caution essential to his safety. And it has been held in numerous cases, both in this country and in England, that there is implied in his contract of service in such cases, that he takes upon himself risks arising from the negligence of his fellow-servants, while in the same employment, provided always the

master is not negligent in their selection or retention, or in furnishing adequate materials and means for the work; and that if injuries then befall him from such negligence, the master is not liable.   The doctrine was first announced in this country by the Supreme Court of South Carolina in 1841, in *Murray* v. *S. C. Railroad Co.*, 1 McMulan, 385, and was affirmed by the Supreme Court of Massachusetts the following year in *Farwell* v. *Boston and Worcester Railroad Co.*, 4 Met. 49.   In the South Carolina case a fireman, whilst in the employ of the company, was injured by the negligence of an engineer also in its employ, and it was held that the company was not liable, the court observing that the engineer no more represented the company than the fireman; that each in his separate department represented his principal; that the regular movement of the train of cars to its destination was the result of the ordinary performance by each of his several duties; and that it seemed to be on the part of the several agents a joint undertaking where each one stipulated for the performance of his several part; that they were not liable to the company for the conduct of each other, nor was the company liable to one for the conduct of another, and that as a general rule, when there was no fault in the owner, he was only liable to his servants for wages.

. In the Massachusetts case, an engineer employed by a railroad company to run a train on its road was injured by the negligence of a switch-tender also in its employ, and it was held that the company was not liable.   The court placed the exemption of the company, not on the ground of the South Carolina decision, that there was a joint undertaking by the fellow-servants, but on the ground that the contract of the engineer implied that he would take upon himself the risks attending its performance, that those included the injuries which might befall him from the negligence of fellow-servants in the same employment, and that the switch-tender stood in that relation to him.   And the court added, that the exemption of the master was supported by considerations of policy:   " Where several persons," it said, " are employed in the conduct of one common enterprise or undertaking, and the safety of each depends on

the care and skill with which each other shall perform his appropriate duty, each is an observer of the conduct of the others, can give notice of any misconduct, incapacity or neglect of duty, and leave the service, if the common employer will not take such precautions and employ such agents as the safety of the whole party may require. By these means the safety of each will be much more effectually secured than could be done by a resort to the common employer for indemnity in case of loss by the negligence of each other." And to the argument, which was strongly pressed, that though the rule might apply where two or more servants are employed in the same department of duty, where each one can exert some influence over the conduct of the other, and thus, to some extent, provide for his own security, yet, that it could not apply where two or more are employed in different departments of duty, at a distance from each other, and where one can in no degree control or influence the conduct of another, it answered, that the objection was founded upon a supposed distinction, on which it would be extremely difficult to establish a practical rule: "When the object to be accomplished," it said, "is one and the same, when the employers are the same, and the several persons employed derive their authority and their compensation from the same source, it would be extremely difficult to distinguish what constitutes one department and what a distinct department of duty. It would vary with the circumstances of every case." And it added, "that the argument rests upon an assumed principle of responsibility which does not exist. The master, in the case supposed, is not exempt from liability because the servant has better means of providing for his safety, when he is employed in immediate connection with those from whose negligence he might suffer, but because the *implied contract* of the master does not extend to indemnify the servant against the negligence of any one but himself; and he is not liable in tort, as for the negligence of his servant, because the person suffering does not stand towards him in the relation of a stranger, but is one whose rights are regulated by contract, express or implied." 4 Met. 59, 60.

The opinion in this case, which was delivered by Chief Jus-

tice Shaw, has exerted great influence in controlling the course of decisions in this country. In several States it has been followed, and the English courts have cited it with marked commendation.

The doctrine of the master's exemption from liability was first distinctly announced in England in 1850 by the Court of Exchequer in *Hutchinson* v. *York, Newcastle & Berwick Railway Co.*, 5 Exch. R. 343. *Priestley* v. *Foster*, 3 M. & W. 1, which was decided in 1837, and is often cited as the first case declaring the doctrine, did not directly involve the question as to the liability of a master to a servant for the negligence of a fellow-servant. In that case a van of the defendant in which the plaintiff was carried was out of repair and overloaded and consequently broke down, and caused the injury complained of; but it did not appear what produced the defect in the van or by whom it was overloaded. The court in giving its decision against the plaintiff observed that if the master was liable, the principle of that liability would " carry us to an alarming extent;" and in illustration of this statement said that if the owner of a carriage was responsible for its sufficiency to the servant, he was, under the principle, responsible for the negligence of his coach-maker or harness-maker or coachman, and mentioned other instances of such possible responsibility to a servant for the negligence of his fellows, concluding that the inconvenience of such consequences afforded a sufficient argument against the application of the principle to that case. The case, therefore, can only be considered as indirectly asserting the doctrine. At any rate, the Hutchinson case is the first one where the doctrine was applied to railway service. There it appeared that a servant of the company who, in the discharge of his duty, was riding on one of its trains, was injured by a collision with another train of the same company, from which his death ensued; and it was held that his representatives could not recover, as he was a fellow-servant with those who caused the injury; and the court said that whether the death resulted from the mismanagement of the one train or the other, or of both, did not affect the principle. The rule was applied at the same time by that court to exempt a master builder from lia-

bility for the death of a bricklayer in his employ caused by the defective construction of a scaffolding by his other workmen, by reason of which it broke and the bricklayer at work upon it was thrown to the ground and killed. *Wigmore* v. *Jay*, 5 Exch. 354.

The doctrine assumes that the servant causing the injury is in the same employment with the servant injured, that is, that both are engaged in a common employment. The question in all cases therefore is, what is essential to render the service in which different persons are engaged a common employment? And this question has caused much conflict of opinion between different courts, and often much vacillation of opinion in the same court.

In *Bartonshill Coal Co.* v. *Reid*, and the *Same Company* v. *McGuire*, reported in 3d Macqueen H. L. Cases, 266, decided in 1858, the parties injured were miners employed to work in a coal pit, and the party, whose negligence caused the injury, was employed to attend to the engine by which they were let down into the mine and brought out, and the coal was raised which they had dug; and it was held that they were engaged in a common work, that of getting coal from the pit. "The miners," said the court in the latter case, "could not perform their part unless they were lowered to their work, nor could the end of their common labor be attained unless the coal which they got was raised to the pit's mouth, and of course at the close of their day's labor the workmen must be lifted out of the mine. Every person who engaged in such an employment must have been perfectly aware that all this was incident to it, and that the service was necessarily accompanied with the danger that the person entrusted with the machinery might be occasionally negligent and fail in his duty." Lord Chancellor Chelmsford, who gave the principal opinion in the latter case, referred to previous cases in which the master's exemption from liability had been sustained, and said : "In the consideration of these cases it did not become necessary to define with any great precision what was meant by the words 'common service' or 'common employment,' and perhaps it might be difficult beforehand to suggest any exact definition of them.

It is necessary, however, in each particular case to ascertain whether the servants are fellow-laborers in the same work, because, although a servant may be taken to have engaged to encounter all risks which are incident to the service which he undertakes, yet he cannot be expected to anticipate those which may happen to him on occasions foreign to his employment. Where servants, therefore, are engaged in different departments of duty, an injury committed by one servant upon another, by carelessness or negligence in the course of his peculiar work, is not within the exemption, and the master's liability attaches in that case in the same manner as if the injured servants stood in no such relation to him." The Lord Chancellor also commented upon some decisions of the Scotch courts, and among others that of *McNaughton* v. *The Caledonian Railway Co.*, 19 Court of Sess. Cases, 271, and said that it might be "sustained without conflicting with the English authorities, on the ground that the workmen in that case were engaged in totally different departments of work; the deceased being a joiner or carpenter, who, at the time of the accident, was engaged in repairing a railway carriage, and the persons by whose negligence his death was occasioned, were the engine driver and the persons who arranged the switches." And in the same case Lord Brougham, after mentioning the observations of a judge of the Scottish courts that an absolute and inflexible rule releasing the master from responsibility in every case where one servant is injured by the fault of another was utterly unknown to the law of Scotland, said that it was also utterly unknown to the law of England, and added: "To bring the case within the exemption there must be this most material qualification, that the two servants must be men in the same common employment, and engaged in the same common work under that common employment."

Later decisions in the English courts extend the master's exemption from liability to cases where the servant injured is working under the direction of a foreman or superintendent, the grade of service of the latter not being deemed to change the relation of the two as fellow-servants. Thus, in *Wilson* v. *Merry*, L. R. 1 H. L. Sc. 326, decided by the House of Lords

in 1868 on appeal from the Court of Sessions of Scotland, the sub-manager of a coal pit, whose negligence in erecting a scaffold which obstructed the circulation of air underneath, and led to an accumulation of fire-damp that exploded and injured a workman in the mine, was held to be a fellow-servant with the injured party. And the court laid down the rule that the master was not liable to his servant unless there was negligence on the master's part in that which he had contracted with the servant to do, and that the master, if not personally superintending the work, was only bound to select proper and competent persons to do so, and furnish them with adequate materials and resources for the work; that when he had done this he had done all that he was required to do, and if the persons thus selected were guilty of negligence, it was not his negligence, and he was not responsible for the consequences. In this case, as in many others in the English courts, the foreman, manager or superintendent of the work, by whose negligence the injury was committed, was himself also a workman with the other laborers, although exercising a direction over the work. The reasoning of that case has been applied so as to include, as contended here, employés of a corporation in departments separated from each other ; and it must be admitted that the terms "common employment," under late decisions in England, and the decisions in this country following the Massachusetts case, are of very comprehensive import. It is difficult to limit them so as to say that any persons employed by a railway company, whose labors may facilitate the running of its trains, are not fellow-servants, however widely separated may be their labors. See *Holden* v. *Fitchburgh Railroad Co.*, 129 Mass. 268.

But notwithstanding the number and weight of such decisions, there are, in this country, many adjudications of courts of great learning restricting the exemption to cases where the fellow-servants are engaged in the same department, and act under the same immediate direction ; and holding that, within the reason and principle of the doctrine, only such servants can be considered as engaged in the same common employment. It is not, however, essential to the decision of the present controversy to lay

down a rule which will determine, in all cases, what is to be deemed such an employment, even if it were possible to do so.

There is, in our judgment, a clear distinction to be made in their relation to their common principal, between servants of a corporation, exercising no supervision over others engaged with them in the same employment, and agents of the corporation, clothed with the control and management of a distinct department, in which their duty is entirely that of direction and superintendence. A conductor, having the entire control and management of a railway train, occupies a very different position from the brakemen, the porters, and other subordinates employed. He is in fact, and should be treated as, the personal representative of the corporation, for whose negligence it is responsible to subordinate servants. This view of his relation to the corporation seems to us a reasonable and just one, and it will insure more care in the selection of such agents, and thus give greater security to the servants engaged under him in an employment requiring the utmost vigilance on their part, and prompt and unhesitating obedience to his orders. The rule which applies to such agents of one railway corporation must apply to all, and many corporations operate every day several trains over hundreds of miles at great distances apart, each being under the control and direction of a conductor specially appointed for its management. We know from the manner in which railways are operated that, subject to the general rules and orders of the directors of the companies, the conductor has entire control and management of the train to which he is assigned. He directs when it shall start, at what speed it shall run, at what stations it shall stop, and for what length of time, and everything essential to its successful movements, and all persons employed on it are subject to his orders. In no proper sense of the terms is he a fellow-servant with the firemen, the brakemen, the porters and the engineer. The latter are fellow-servants in the running of the train under his direction; as to them and the train, he stands in the place of and represents the corporation. As observed by Mr. Wharton in his valuable treatise on the Law of Negligence: "It has sometimes been said that a corporation is

obliged to act always by servants, and that it is unjust to impute to it personal negligence in cases where it is impossible for it to be negligent personally. But if this be true it would relieve corporations from all liability to servants. The true view is, that, as corporations can act only through superintending officers, the negligences of those officers, with respect to other servants, are the negligences of the corporation." § 232 *a*. The author, in a note, refers to *Brickner* v. *New York Central Railroad Co.*, 2 Lansing, 506, decided in the Supreme Court of New York, and afterwards confirmed in the Court of Appeals, 49 N. Y. 672; and to *Malone* v. *Hathaway*, 64 N. Y. 5, decided in the latter court, in which opinions are expressed in conformity with his views. These opinions are not, it is true, authoritative, for they do not cover the precise points in judgment; but were rather expressed to distinguish the questions thus arising from those then before the court. They indicate, however, a disposition to engraft a limitation upon the general doctrine as to the master's exemption from liability to his servants for the negligence of their fellows, when a corporation is the principal, and acts through superintending agents. Thus, in the first case, the court said: "A corporation cannot act personally. It requires some person to superintend structures, to purchase and control the running of cars, to employ and discharge men, and provide all needful appliances. This can only be done by agents. When the directors themselves personally act as such agents, they are the representatives of the corporations. *They are then* the executive head or master. Their acts are the acts of the corporation. The duties above described are the duties of the corporation. When these directors appoint some person other than themselves to superintend and perform all these executive duties for them, then such appointee, equally with themselves, represents the corporation as master in all those respects. And though, in the performance of these executive duties, he may be, and is, a servant of the corporation, he is not in those respects a co-servant, a co-laborer, a co-employé, in the common acceptation of those terms, any more than is a director who exercises the same authority." Page 516.

And in *Malone* v. *Hathaway*, in the Court of Appeals, Judge Allen says: "Corporations necessarily acting by and through agents, those having the superintendence of various departments, with delegated authority to employ and discharge laborers and employés, provide materials and machinery for the service of the corporation, and generally direct and control under general powers and instructions from the directors, may well be regarded as the representatives of the corporation, charged with the performance of its duty, exercising the discretion ordinarily exercised by principals, and, within the limits of the delegated authority, the acting principal. These acts are in such case the acts of the corporation, for which and for whose neglect the corporation, within adjudged cases, must respond, as well to the other servants of the company as to strangers. They are treated as the general agents of the corporation in the several departments committed to their care." 64 N. Y. 5, 12. See also *Corcoran* v. *Holbrook*, 59 N. Y. 517.

In *Little Miami Railroad Co.* v. *Stevens*, 20 Ohio, 415, the Supreme Court of Ohio held that where a railroad company placed the engineer in its employ under the control of a conductor of its train, who directed when the cars were to start, and when to stop, it was liable for an injury received by him caused by the negligence of the conductor. There a collision between two trains occurred in consequence of the omission of the conductor to inform the engineer of a change of places in the passing of trains ordered by the company. Exemption from liability was claimed on the ground that the engineer and conductor were fellow-servants, and that the engineer had in consequence taken, by his contract of service, the risk of the negligence of the conductor; and, also, that public policy forbade a recovery in such cases. But the court rejected both positions. To the latter it very pertinently observed, that it was only when the servant had himself been careful that any right of action could accrue to him, and that it was not likely that any would be careless of their lives and persons or property merely because they might have a right of action to recover for injuries received. "If men are influenced," said

the court, " by such remote considerations to be careless of what they are likely to be most careful about, it has never come under our observation. We think the policy is clearly on the other side. It is a matter of universal observation that, in any extensive business where many persons are employed, the care and prudence of the employer is the surest guarantee against mismanagement of any kind." In *Railway Co.* v. *Keary*, 3 Ohio St. 201, the same court affirmed the doctrine thus announced, and decided that when a brakeman in the employ of a railroad company, on a train under the control of a conductor having exclusive command, was injured by the carelessness of the conductor, the company was responsible, holding that the conductor in such case was the sole and immediate representative of the company upon which rested the obligation to manage the train with skill and care. In the course of an elaborate opinion the court said that from the very nature of the contract of service between the company and the employés, the company was under obligation to them to superintend and control with skill and care the dangerous force employed, upon which their safety so essentially depended. " For this purpose," said the court, " the conductor is employed, and in this he directly represents the company. They contract for and engage his care and skill. They commission him to exercise that dominion over the operations of the train which essentially pertains to the prerogatives of the owner; and in its exercise he stands in the place of the owner, and is in the discharge of a duty which the owner, as a man, and a party to the contract of service, owes to those placed under him, and whose lives may depend on his fidelity. His will alone controls everything, and it is the will of the owner that his intelligence alone should be trusted for this purpose. This service is not common to him and the hands placed under him. They have nothing to do with it. His duties and their duties are entirely separate and distinct, although both necessary to produce the result. It is his to command, and theirs to obey and execute. No service is common that does not admit a common participation, and no servants are fellow-servants when one is placed in control over the other."

In *Louisville & Nashville Railroad Co.* v. *Collins*, 2 Duvall, 114, the subject was elaborately considered by the Court of Appeals of Kentucky. And it held, that in all those operations which require care, vigilance and skill, and which are performed through the instrumentality of superintending agents, the invisible corporation, though never actually, is yet always constructively present through its agents who represent it, and whose acts within their representative spheres are its acts; that the rule of English courts, that the company is not responsible to one of its servants for an injury inflicted from the neglect of a fellow-servant, was not adopted to its full extent in that State, and was regarded there as anomalous, inconsistent with principle and public policy, and unsupported by any good and consistent reason. In commenting upon this decision in his Treatise on the Law of Railways, Redfield speaks with emphatic approval of the declaration that the corporation is to be regarded as constructively present in all acts performed by its general agents within the scope of their authority. "The consequences of mistake or misapprehension upon this point," says the author, "have led many courts into conclusions greatly at variance with the common instincts of reason and humanity, and have tended to interpose an unwarrantable shield between the conduct of railway employés and the just responsibility of the company. We trust that the reasonableness and justice of this construction will at no distant day induce its universal adoption." Vol. 1, 554.

There are decisions in the courts of other States, more or less in conformity with those cited from Ohio and Kentucky, rejecting or limiting, to a greater or less extent, the master's exemption from liability to a servant for the negligent conduct of his fellows. We agree with them in holding—and the present case requires no further decision—that the conductor of a railway train, who commands its movements, directs when it shall start, at what stations it shall stop, at what speed it shall run, and has the general management of it, and control over the persons employed upon it, represents the company, and therefore that, for injuries resulting from his negligent acts, the company is responsible. If such a conductor does not represent

the company, then the train is operated without any representative of its owner.

If, now, we apply these views of the relation of the conductor of a railway train to the company, and to the subordinates under him on the train, the objections urged to the charge of the court will be readily disposed of. Its language in some sentences may be open to verbal criticism; but its purport touching the liability of the company is, that the conductor and engineer, though both employés, were not fellow-servants in the sense in which that term is used in the decisions; that the former was the representative of the company, standing in its place and stead in the running of the train, and that the latter was, in that particular, his subordinate, and that for the former's negligence, by which the latter was injured, the company was responsible.

It was not disputed on the trial that the collision which caused the injury complained of was the result of the negligence of the conductor of the freight train, in failing to show to the engineer the order which he had received, to stop the train at South Minneapolis until the gravel train, coming on the same road from an opposite direction, had passed; and the court charged the jury, that if they so found, and if the plaintiff did not contribute to his injury by his own negligence, the company was liable, holding that the relation of superior and inferior was created by the company, as between the two in the operation of its train; and that they were not, within the reason of the law, fellow-servants engaged in the same common employment.

As this charge was, in our judgment, correct, the plaintiff was entitled to recover upon the conceded negligence of the conductor. The charge on other points is immaterial; whether correct or erroneous, it could not have changed the result; the verdict of the jury could not have been otherwise than for the plaintiff. Without declaring, therefore, whether any error was committed in the charge on other points, it is sufficient to say that we will not reverse the judgment below if an error was committed on the trial which could not have affected the verdict. *Brobst* v. *Brock*, 10 Wall. 519. And, with respect to the

negligence of the conductor of the gravel train, no instruction
was given or requested.

*Judgment affirmed.*


Mr. Justice Bradley, dissenting.

Justices Matthews, Gray, Blatchford and myself dissent
from the judgment of the court. We think that the conductor
of the railroad train in this case was a fellow-servant of the
railroad company with the other employés on the train. We
think that to hold otherwise would be to break down the long
established rule with regard to the exemption from responsibil-
ity of employers for injuries to their servants by the negligence
of their fellow-servants.