[No. 5847. Decided March 3, 1906.]

JOHN S. GRIM, *Respondent,* v. OLYMPIA LIGHT & POWER COMPANY, *Appellant.*[1]

MASTER AND SERVANT—NEGLIGENCE—FELLOW SERVANTS—MOTORMEN ON STREET RAILWAY. Motormen in the employ of a street railway company are fellow servants where it appears that the company had two freight motors for service on the line, which they were in charge of, that there was no fixed schedule for the running thereof, but the motormen arranged their own time schedules and places for meeting and passing, and were for over a year continually in a position offering opportunities for conferring and exercising influence and caution over one another (HADLEY and DUNBAR, JJ., dissenting).

SAME—ASSUMPTION OF RISK. In such a case one motorman runs the risk of injury from a collision with the other car happening through the failure of the motorman to stop the same upon a foggy morning where fogs were of frequent occurrence (HADLEY and DUNBAR, JJ., dissenting).

1Reported in 84 Pac. 635.

Appeal from a judgment of the superior court for Thurston county, Linn, J., entered May 20, 1905, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a motorman in a collision of street cars. Reversed.

*T. N. Allen, Troy & Falknor,* and *E. C. Hughes,* for appellants.

*Vance & Mitchell,* for respondent.

CROW, J.—This is an action to recover for personal injuries. The appellant is the owner and operator of a single track electric railway line, between the city of Olympia and the town of Tumwater. The line is used for the transportation of both passengers and freight. At Tumwater is located a brewery, and the tracks of the appellant company extend to the brewery for the purpose of affording means to transport beer in large quantities to the Northern Pacific railway depot, and also to a shipping dock, both of which are in Olympia. The electric railway company supplies the necessary cars, and motormen and brakemen to operate them, for transporting the beer.

Long prior to and at the time of the happening of the events here involved, it had been customary for the brewery company to call out cars whenever it desired to make shipments. No regular time schedule was, or could be, established for the running of the beer cars. There were at least four switches along the line, which were used to facilitate the passage of the cars. The operators of the cars were authorized to select the times for their running, and in this they appear to have been unrestricted except in the observance of the time schedules for passenger cars. Two beer cars were in use, and the motormen controlled their running time.

The method of operation was substantially as follows: When a car was loaded with beer at Tumwater, it was taken over the line to Olympia, and after the load was discharged,

was started on the return trip to Tumwater. Ordinarily it was expected that somewhere on the line the other car would be met on its way to Olympia with a load of beer. There was no established rule or custom as to a place for meeting and passing. The custom adopted by the motormen themselves seems to have been for each car to proceed when ready to go, and when it reached a switch, if the other car was not there and could not be seen approaching, the car at the switch continued on its course until it met the other car at a switch or elsewhere. If the two met between switches, the one nearest a switch was expected to retreat to such switch where a passage was effected. These arrangements were made by the motormen themselves, being the result of such conferences as they were enabled to have from time to time as they came in touch with each other.

On the day respondent received his injuries, he was acting as motorman of one of the beer cars. A Mr. Dye was motorman of the other car, and the latter car also pushed in front of it a flat car, both being loaded with beer. A Mr. Edwards was brakeman for the flat car. There were no conductors, the motormen having control of the movements of the cars. At an early hour in the morning, respondent proceeded to Tumwater with his car, where it was loaded with beer. He then started for Olympia. About the time he left Tumwater he saw that the other car and flat car had arrived in charge of Mr. Dye, and he knew that it was Dye's intention, when the cars were loaded, to immediately proceed with them to Olympia. Respondent proceeded with his car to Olympia, where the load was soon discharged, and he thereupon started on the return trip to Tumwater. He passed several switches without meeting the other car and flat car. The morning was very foggy, witnesses for appellant claiming the fog was generally heavy at all parts along the line, including the point of collision hereinafter mentioned; while respondent's witnesses contended it was "banked," being much heavier at

some places than at others. Respondent was accompanied on the return trip by his son, and also by a Mr. McIntosh, an employee of the brewery.

Testimony of the respondent was to the effect that his car was going at the rate of from five to eight miles per hour, when he and his companions discovered the other car with the flat car in front of it approaching through the fog. They estimate the distance between the two when they first saw the approaching cars at from two hundred to three hundred feet. Appellant's witnesses estimate the distance at from one hundred to one hundred and twenty-five feet. Respondent's witnesses also estimate the speed of the other cars to have been considerably greater than that of respondent's car, but appellant's witnesses estimate it at less.

Respondent's companions jumped from his car, but he remained at his post and says he succeeded in stopping. He also says he had just succeeded in starting his car on a backward movement, when the flat car plunged into his own. Appellant's witnesses contended that respondent never succeeded in stopping his car. Prior to the collision, the other motorman, Dye, and the flat car brakeman, Edwards, had jumped from their car. The latter was not at his brake upon the flat car, but was standing by the motorman on the motor car. The first impact stayed the progress of the flat car and its motor car, and caused them to retreat slightly; but immediately they plunged again into the respondent's car, and he was injured. Immediately after this, Mr. McIntosh jumped upon the pursuing motor car, and stopped it. Respondent says that, when he saw the other cars approaching, he believed there was time to avoid a collision; that if the power had been disconnected and the brakes set upon the approaching cars, as it was the duty of the motorman and brakeman to do, and as he assumed would be done, the collision would not have occurred. The testimony was conflicting as to whether Dye had set his brake and turned off the current before leaving his car.

The foregoing, we believe, is a fair statement of the more material facts. While there is some dispute as to some of them, yet we assume for the purposes of this opinion that the verdict of the jury has established the facts in accordance with respondent's contention. The complaint charges the appellant with negligence in the operation of the approaching cars, and avers that respondent had no power or authority of any kind over them. Other allegations of negligence were made, but are not before us on this appeal. The answer denies that the appellant was negligent; alleges that the respondent and the motorman upon the other car were fellow servants; that respondent was guilty of contributory negligence, and that he assumed the risk. The cause was tried before a jury, and a verdict was returned for the respondent. Appellant's motion for a new trial was denied. Judgment was entered upon the verdict, and this appeal has been taken.

Numerous assignments of error have been made, but we will discuss those only which have a controlling influence on this case as it is regarded by the majority of this court. Appellant's principal contention is that, under the undisputed facts as disclosed by the evidence, respondent and Dye were fellow servants; that if any negligent act was performed by Dye, it was the act of respondent's fellow servant for which appellant was not liable. On the other hand, respondent contends that Dye in charge of one train and respondent in charge of the other were vice principals or representatives of appellant, their common master. In support of this contention, respondent bases especial reliance upon the case of *Northern Pac. R. Co. v. O'Brien,* 1 Wash. 599, 21 Pac. 32, in which our territorial supreme court followed *Chicago etc. R. Co. v. Ross,* 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787. Respondent also calls attention to the fact that, although the *Ross* case has been overruled in *New England R. Co. v. Conroy,* 175 U. S. 323, 20 Sup. Ct. 85, 44 L. Ed. 181, this court has still adhered to the doctrine of the *Ross* case in

*Mullin v. Northern Pac. R. Co.,* 38 Wash. 550, 80 Pac. 814. With other authorities, he also cites *Conine v. Olympia Logging Co.,* 36 Wash. 345, 78 Pac. 932, in which this court cites with approval the case of *Cooper v. Mullins,* 30 Ga. 146.

We have carefully considered all these authorities, and others of similar character cited by respondent, but are unable to arrive at any other conclusion than to hold respondent and Dye to have been fellow servants. In *Hammarberg v. St. Paul etc. Lumber Co.,* 19 Wash. 537, 53 Pac. 727, Dunbar, J., after discussing the history of the doctrine of fellow servant, and commenting on the fact that the principles involved had by some courts, by inharmonious and indiscriminate application, been made productive of oppressive wrong, said:

"It is gratifying, however, to observe that recently judicial opinion seems to favor a restriction of the doctrine of nonliability for the actions of fellow servants, and the English rule, that a servant in command is a fellow servant, has been repudiated by a great majority of the American cases, and it seems now to be pretty well established that, in order to constitute one a fellow servant, he must be in the same common employment with the one who has suffered from his negligence. Shearman & Redfield, Negligence (4th ed.), § 234. And the question of whether particular employees are fellow servants is in some states submitted to the jury. *Mullan v. Philadelphia & S. M. S. Co.,* 78 Pa. St. 25 (21 Am. Rep. 2). The rule was announced in that case that the risk which the laborer assumes from the neglect of his fellow is where they are co-operating in the same business, so that he knows that the employment is one of the incidents of their common service. It has been held in Georgia that none are deemed to be in a common employment who have no opportunity to use precautions against each other's negligence. *Cooper v. Mullins,* 30 Ga. 146 (76 Am. Dec. 638). And this, we think, is in strict consonance with the just theory upon which the rule was first recognized."

There is no doubt but that the doctrine of nonliability of the master for negligent acts of fellow servants has been materially restricted in this, as well as some other jurisdic-

tions, but it certainly has not been entirely abolished. The rules of consociation of duties and connective or controlling influence are recognized by us.

In the latter portion of § 501, of his work on Master & Servant, Mr. Labatt says:

"The existence of common employment resolves itself into the inquiry, whether there was such a relation between the duties of the negligent and delinquent servants,—such consociation and co-operation in the performance of the work which was being done when the injury was received,—that such self-protection was reasonably feasible by one or other of the means noted in the cases cited in the following section."

Then follows § 501a, noting the various means of self-protection, in which the author in part says:

"An examination of the cases shows that the elements upon the existence or nonexistence of which the applicability or non-applicability of the doctrine of consociation depends are those indicated by the following paragraphs: (1) The fact that the injured servant had or had not an opportunity of observing the extent to which the negligent servant was competent for the performance of his duties and the manner in which he habitually conducted himself. . . . (3) the fact that the injured servant was or was not able to lessen the risk of injury, by exercising upon the negligent servant an influence calculated to promote caution and diligence on the part of the latter. . . . It will be found that the whole of these elements are seldom adverted to in a single case. As a general rule the courts content themselves with a reference to that particular one which happens to be suggested by the special aspect of the evidence under which the case has been submitted."

The undisputed evidence shows appellant had passenger cars running according to a fixed schedule or time table; that it had only two freight motor cars, one in charge of Mr. Dye and the other in charge of respondent. These freight motor cars had no fixed time or schedule for running, nor was it practicable that they could or should have any. They were called out at irregular and uncertain intervals by the brewery

people, when needed for hauling beer or other freight. The motormen in charge of these cars had received general instructions from appellant's manager against running at a high or unsafe rate of speed, and by common rule or consent of the company were permitted and expected to otherwise arrange their own schedule and plans. By reason of the necessity of the case, occasioned by their irregular periods of running, they arranged their own places of meeting and passing. It is not contended that the cars were in an unsafe condition, or that they were not properly constructed and equipped. Neither is it contended that the track, switches, or, in fact, any portions of the right of way were out of repair, or in a dangerous condition. Respondent had been employed in charge of his freight motor car for several years, and Dye, in charge of his for more than one year prior to the accident. During all this period of joint service they had personally arranged places of meeting, had acted together in one common employment, and were almost continually in a position affording frequent and repeated opportunities for conferring together and exercising influence and caution, the one over the other.

Now, applying the rules laid down by Mr. Labatt in the section—501a—above quoted, if any one of the methods of mutual self-protection mentioned by him existed, they were fellow servants and not vice principals. We find that respondent had ample opportunity for personally observing the extent to which Mr. Dye was competent for the performance of his duties, and the manner in which he habitually conducted himself; also that respondent had opportunities to lessen his risk of injury by exercising upon Mr. Dye an influence calculated to promote caution and diligence on his part. In *Donnelly v. Cudahy Packing Co.*, 68 Kan. 653, 75 Pac. 1017, the supreme court of Kansas says:

"From the authorities the following rule may be deduced: Whenever coemployees, under the control of one master, are

engaged in the discharge of duties directed to one common end, such duties being so closely related that each employee must know he is exposed to the risk of being injured by the negligence of another, they are fellow servants, and each assumes the risk to which he is thus exposed."

In 1897 the legislature of the state of Missouri enacted a statute providing that every railroad corporation owning or operating a railroad in that state should be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof; thus abolishing the defense of fellow servants as to employees of such a company. This statute placed a greater restriction on the doctrine of fellow servant, when applied to employees of steam railroads, than has ever been recognized in this state; yet the supreme court of Missouri, in *Sams v. St. Louis etc. R. Co.*, 174 Mo. 53, 73 S. W. 686, 61 L. R. A. 475, not only held this statute did not apply to street railway employees, but also held a motorman and conductor on an electric street car to be fellow servants. Afterwards the court of appeals of Missouri, in *Stocks v. St. Louis Transit Co.*, 106 Mo. App. 129, 79 S. W. 1176, held a conductor on one trolley car was the fellow servant of a motorman operating another trolley car on the same line of street railway so that the one could not recover damages for personal injuries sustained by reason of the negligence of the other while in the discharge of his duties. In *Chicago City R. Co. v. Leach*, 208 Ill. 198, 70 N. E. 222, 100 Am. St. 216, the supreme court of Illinois held a gripman on one cable car to be the fellow servant of a conductor on another.

We think these authorities show a tendency on the part of the various courts of this country to apply a less strict rule to the doctrine of fellow servants when employees of a street railway company are concerned, than is applied to employees of a steam railway company. The distinction is apparent and reasonable, as it grows out of the fact that the

employees of street railway companies have more favorable and frequent opportunities to associate together and to exercise a controlling or restrictive influence one over the other. As said by the supreme court of Illinois, there is no similarity between the relations of servants on different trains on a steam railroad which are run under orders and directed by a train dispatcher, for the purpose of preventing interference and collision, and the relations of servants on street cars which followed each other over tracks and managed their trains with reference to each other.

In this case it was the duty of the respondent and the motorman Dye to jointly manage their trains in such a manner as to avoid collision or danger, and for this purpose they had ample authority and opportunity to complete arrangements satisfactory to themselves. Under the undisputed facts of this case, we arrive at the conclusion that respondent and Dye were fellow servants, and that appellant as their common master was not liable for any personal injuries which respondent has sustained by reason of any negligent acts of Dye, performed by him while in the discharge of his duties as motorman.

Without regard to the question of fellow servant, respondent cannot recover, for the further reason that he assumed all risks and dangers naturally or necessarily incident to his employment. He was engaged as motorman in charge of his car, running under the same methods and on the same plan for a period of several years prior to the accident, and for more than one year had been associated with Dye to such an intimate extent that he had ample opportunity for observing the manner in which Dye discharged his duties, and also had ample opportunity for knowing all dangers liable to arise. It was a very common occurrence for fogs to prevail upon the line of the right of way, and respondent must have known that additional dangers were liable to arise by the presense of such fogs. This accident was one respondent might have anticipated as a natural consequence of existing conditions,

and the system under which the freight cars were operated. In any event, he must be held to have been fully aware of all the dangers necessarily incident to his employment, and having continued in such employment for several years, he must be held under the law to have assumed all the risks necessarily incident thereto, and such assumption of risk is an available defense to be interposed by appellant.

In view of what we have said upon the defenses of fellow servant and assumption of risk, it is not necessary to discuss any other assignments of error. The judgment of the superior court is reversed, and the cause is remanded with instructions to dismiss the action.

MOUNT, C. J., and ROOT, J., concur.

FULLERTON, J., concurs in the result.

RUDKIN, J., concurs on the first ground discussed in the opinion.

HADLEY, J. (dissenting)—I dissent from the conclusion reached by the majority in this case. In view of former decisions of this court upon the subject of fellow servants, I believe the majority opinion tends to create confusion as to what doctrine the court intends to establish in relation to liability for the acts of employees under some circumstances.

Appellant's counsel have exhaustively and ably argued the law upon the subject of fellow servants, and have cited and reviewed many authorities. The authorities upon this subject are so hopelessly at variance that it would be as impossible to harmonize them as it would be unprofitable to review them in this opinion. This court early approved the doctrine of *Chicago etc. R. Co. v. Ross,* 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787. It was held in that case that a conductor of a railway train, or one who has the right to command the movements of the train, represents the company while performing those duties, and does not sustain the relation of a

fellow servant to other employees of the company on the train. This court applied the doctrine of that case in an opinion written by Burke, C. J., in the early case of *Northern Pac. R. Co. v. O'Brien*, 1 Wash. 599, 21 Pac. 32. It is true that decision was rendered in territorial days, and a short time before the organization of the state, but the court as subsequently organized has repeatedly applied the principles of the *Ross* case. In the late case of *Mullin v. Northern Pac. R. Co.*, 38 Wash. 550, 80 Pac. 814, the court said:

"Appellant cites the leading case of *New England R. Co. v. Conroy*, 175 U. S. 323, 20 Sup. Ct. 85, 44 L. Ed. 181, where that court enters into a lengthy review of the doctrine of fellow servants, and overrules the case of *Chicago etc. R. Co. v. Ross*, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787. This court has previously avowed its determination to abide by the principles announced in the decision of the *Ross* case, and has refused to follow the doctrines announced in the later case just above cited."

It will therefore be seen that this court has refused to depart from the principles of the *Ross* case, notwithstanding the fact that it has been overruled by the court that rendered that decision. If the principles of the *Ross* case are applied to the case at bar, then the motorman who controlled and directed the approaching car was not a fellow servant with respondent. He was not under the direction of any conductor, but had entire charge of the movements of the car, and as fully represented the master as did the conductor in the *Ross* case. Under the rule here discussed, both he and respondent were delegated by appellant to control their respective cars, and each stood as the representative of appellant, controlling and directing an independent agency of appellant's business, that agency being the management and control of a car for the transportation of freight. The cars were as distinct in their character as separate railway trains, unless a different rule should be applied to electric or street railway companies, which appellant contends should be done.

Upon this point the case of *Chicago City R. Co. v. Leach,*
208 Ill. 198, 70 N. E. 222, 100 Am. St. 216, is cited. It
was held in that case that gripmen and conductors whose
duties are to run their trains in such a manner as not to in-
jure those in charge of trains next preceding or following
them, and who have power and opportunity to exert an in-
fluence over each other, are fellow servants with other men in
the service running such preceding or following trains. The
theory of the decision is, that such employees are engaged
in the same character of service; that they are brought into
such relations with each other as to depend upon each other
for their safety, and that they have power to observe the man-
ner in which each discharges his duty, and to influence each
other by caution, advice, and example. Three judges refused
to concur in the opinion, and dissented. The supposed in-
fluence of one employee over another under such circum-
stances, it seems to me, is too remote. How can an employee
upon one car, who is busy attending to his own duties, antici-
pate the negligence of those in charge of another in such a de-
gree as to exercise a preventive influence when the negligence
occurs? The opportunity to exercise such an influence at
such a time, in the nature of things, would seldom be afforded.
The opportunity for that preventive influence which estab-
lishes the relation of fellow servant should be such as enables
one to exert some such reasonably direct influence as may
tend to avoid threatened negligence that may result in in-
jury. Such was the theory upon which *Conine v. Olympia
Logging Co.,* 36 Wash. 345, 78 Pac. 932, was decided. I
am unable to distinguish in principle between the relations of
Conine and the engineer in that case and those of respondent
and the controller of the approaching car in this case. In
the former case we said:

"The situation alleged as we have seen, was such that ap-
pellant could not see the engineer, and had not an opportunity
to exercise any preventive influence over him, or to guard
himself against the act of starting the engine at the time it

was done. They were neither in sight, nor within reasonable hearing distance of each other. While the work of each was directed to a common end, yet they were so remote from each other that they had no opportunity for the connective influence by which one fellow servant is required to guard himself against the neglect of another, and it appears that sufficient means for so doing had not been supplied by respondent."

In any event, the circumstances of the Illinois case differed from those in the case at bar. That involved a double track street railway, and there were established rules for operating cars under a regular and continued service, while the cars in the case at bar were operated at irregular and uncertain intervals. But even if the facts were in all respects similar, I am nevertheless unable to distinguish the present case from the principle applied in the *Conine* case. Other decisions are cited by appellant to the point that the employees upon one street car are fellow servants with those upon another. These are based upon the theory that the association of such employees is sufficiently close to enable them to exercise a preventive influence over each other and are from jurisdictions where this doctrine has not been limited to as close association in a common employment as has been done in this state. Some Federal decisions are cited. Emphasis is placed upon the authority of the case of *Baltimore Trust etc. Co. v. Atlanta Traction Co.*, 69 Fed. 358, as being exactly in point here. There it was held that the conductors of two electric railway cars on the same road are fellow servants, and that the common employer is not liable for an injury to one resulting from a collision caused by the negligence of the other. The trial judge said in the opinion

"The question is raised as to whether the two conductors are fellow servants, as applicable to the question of employers' liability. My opinion is that they are. I think they are such under the general law and under the decisions of the supreme court of the United States. Any other conclusion

cannot be reached from the later decisions of the supreme court."

It will be observed that the learned judge refers to the authority of the later decisions of the supreme court of the United States. The decision in the *Ross* case had not been actually overruled at that time, but the tendency of the later decisions was such that the Federal trial judge doubtless felt under obligations to hold as he did. In view of the position which this court has taken as to the *Ross* case, the later Federal decisions are not authority here. Under the decisions of this court, the motorman of the approaching car in the case at bar was the delegated representative of the master, having control and direction of the car, and the respondent at the time of the accident was not associated with him in such a common employment as enabled him to exercise a preventive control or influence over the motorman, and make him the fellow servant of the latter. If the motorman was negligent, then as the master's representative, his negligence became that of the master so far as his relation to the respondent was concerned. Whether he was negligent in abandoning the car, in failing to disconnect the power and set the brakes, and whether his acts in the premises proximately caused the collision and injury, were all for the jury. A similar application of principles was made by this court in the following cases: *Bateman v. Peninsular R. Co.*, 20 Wash. 133, 54 Pac. 996; *Uren v. Golden Tunnel Min. Co.*, 24 Wash. 261, 64 Pac. 174; *Shannon v. Consolidated etc. Min. Co.*, 24 Wash. 119, 64 Pac. 169; *Brabon v. Seattle*, 29 Wash. 6, 69 Pac. 365; *Howe v. Northern Pac. R. Co.*, 30 Wash. 569, 70 Pac. 1100.

The majority opinion holds that respondent assumed the risk of the danger. He did not assume the risk of negligence of appellant through its representative in the matter of improperly controlling and handling the operating mechanism of the other car. He was not required to anticipate negligence in that regard. That danger would arise from such

negligence of the master's representative was not to him open and obvious, and every reasonable expectation was against it. In that particular appellant was obligated to furnish him a safe place in which to work. Appellant is not relieved from the responsibility because it left these men free to operate the cars when they chose. The railway and cars belonged to appellant, and they were being operated by its authority, in its behalf, and for its profit. It had delegated the motorman to direct and control the movements of the approaching car, and respondent did not assume the risk of negligent control of that car.

Upon any ground discussed in the majority opinion, I think the judgment should be affirmed.

DUNBAR, J. (dissenting)—I concur in what Judge Hadley has said above, and fear that it will be difficult now to determine what the law in relation to fellow servants is in this state.