[No. 7976. Department Two. January 12, 1910.]

HOWARD G. CRAIG, *Appellant*, v. GREAT NORTHERN RAILWAY COMPANY *et al.*, *Respondents*.[1]

MASTER AND SERVANT — NEGLIGENCE OF MASTER — DEFECTIVE BRAKES—PROXIMATE CAUSE—CONTRIBUTORY NEGLIGENCE. The conductor of a street car, injured in a collision at a railroad crossing, is guilty of contributory negligence which is the proximate cause of the accident, where it appears that he and the motorman knew that the brakes on a large suburban car were out of order and would not stop the car readily, that he permitted the motorman to approach the railroad crossing at a speed of thirty miles an hour until within seventy-five feet of the crossing without making any effort to reduce the speed, although he had power to control the car by signals, and knew the location, in violation of the rule against crossing without coming to a stop and going ahead to see if the crossing was clear.

SAME—FELLOW SERVANTS. In such a case, if the negligent rate of speed was the fault of the motorman, it was the act of a fellow servant, precluding any recovery by the conductor.

DUNBAR and PARKER, JJ., dissent.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered September 19, 1908, in favor of the defendant, by direction of the court, after a trial before the court and a jury, in an action for injuries sustained by a conductor of a street car in a collision. Affirmed.

*Fred Miller* and *George A. Latimer*, for appellant.

*H. M. Stephens*, for respondent Washington Water Power Company.

MOUNT, J.—The plaintiff was employed as a conductor on one of the cars of the defendant Washington Water Power Company, which company operates a street car system in the city of Spokane. While so employed and in charge of one of its cars, plaintiff was injured by a collision of said car with an engine of the railway company, at a crossing of the tracks

[1]Reported in 106 Pac. 155.

of the defendants, which he alleges was by reason of the neg-
ligence of both defendants.    The cause proceeded to trial
before the court and a jury, and at the close of the plaintiff's
evidence, the court, upon separate motions of both the rail-
way company and the power company, withdrew the cause
from the jury and entered judgment separately, dismissing
the case.    No error is assigned upon the dismissal as to the
railway company.   The negligence alleged against the power
company is, in substance, that it negligently furnished for
the plaintiff and motorman an old, unfit, and defective car,
said car being out of repair, the air brakes and other appara-
tus employed in controlling the same being old, defective, and
insufficient, so that said car could not be controlled by means
of said apparatus provided therefor; that the hand brakes
and other apparatus for controlling the car were old, de-
fective, and out of repair, so that the car would not respond
to the application thereof, as was at the time well known to
defendant power company; and that, by reason of such defect-
ive brakes and their refusal to work or to control the move-
ments of the car, it passed upon the track of the railway
company and came in collision with an engine running thereon
at a high rate of speed, resulting in plaintiff's injuries.

The dismissal by the court as to the power company was
upon the ground that the injuries of which appellant com-
plains were caused by the negligence of the motorman in
running at an excessive rate of speed, and in failing to
properly apply the brakes, and not by the defective condi-
tion thereof, and being the negligence of a fellow servant,
was not such as rendered the power company liable.    From
the order and judgment of the learned trial court thus dis-
posing of the cause, plaintiff appeals, bringing all of the
evidence here for our review upon the errors assigned.

The question presented is, Was there sufficient evidence of
the power company's negligence being a proximate cause
of the injury to entitle plaintiff to have that question sub-

mitted to the jury? From the evidence the following appears. The accident occurred at the crossing of the tracks of the railway company and the power company, by an engine of the railway company coming in collision with a car of the power company on which appellant was working as conductor, while the car was crossing the railway company's track, the motorman having failed to stop the car before reaching the crossing, as required by the rules of the power company, to enable the conductor to get off the car, see that the railway track was clear and no trains approaching thereon, and then signal the motorman to go ahead; this rule being well known to both the appellant and motorman as a requirement of the power company as to all steam railway crossings.

The line upon which the accident occurred, and on which the car in charge of appellant and the motorman was running, is known as the Minnehaha line, and runs from the junction of Howard street and Riverside avenue, as a starting point, near the center of the city, several miles to the suburbs, making the round trip in one hour. The accident occurred January 27, 1907, about 8:20 p. m. Appellant had been working for the power company as a conductor for some time previously, but not upon this line. He commenced on this line and on this car at 4:38 p. m., that day, starting from Howard street and Riverside avenue. Three full round trips had been made, and it was upon the return of the fourth trip that the accident occurred. At this last time of approaching the railway crossing, it is claimed by appellant that the brakes on the car failed to work when the motorman attempted to stop, as the rules required, and for that reason alone, the car ran upon the crossing, when it was struck by a rapidly moving engine of the railway company, resulting in injuries to appellant and also injuries to the motorman from which he died a few hours later.

Substantially all of the evidence in the record relating to the condition of the brakes on the car and the cause of the

accident is that contained in the testimony of the appellant himself, the substance of which is contained in the following:

"Q. When a car is on a run where is it inspected? A. If you complain about it the inspector does. Q. What inspector, the one on duty where? A. At Howard and Riverside. . . . Q. Now had you on that run observed whether the gripman, or the motorman, was having any difficulty stopping at the crossings? A. Yes, I took notice after he reported it at Howard and Riverside, and I noticed on two or three occasions he ran past several passengers and had to back up for them. . . . Q. What, if any, warning signal did you get of the approach of the engine? A. I could feel the car kind of jumping as we was getting to the end of the line. . . . Q. Did you see the motorman, what was he doing at the time it was struck? A. He had the emergency on when I went on under the curtain. He put it on at five, and then at full speed, and then it hitched. . . . Q. What is the emergency? A. That is one way of stopping the car. Q. Is that the most extreme way of stopping the car? A. They generally use that when nothing else will work. . . . Q. Did you see him apply the air? A. No, I did not see him apply the air. Just seen he had the emergency on. Q. Did it stop when he put the emergency on? A. No, sir, it was still running. . . .

"Q. It was your business, if the car was out of repair, to take it into the shop? A. It was my business, if the car was out of repair, to report it to the inspector at Howard and Riverside, and he gave instructions and I obeyed them. Q. You weren't entitled to take a car into the shops without orders from the inspector at Howard and Riverside? A. Yes, sir. Q. Who was inspector on this 27th of January, 1907? A. I don't know. I know he said, 'I am going to report this car to the inspector.' Q. Who said that? A. Nickerson (motorman). I heard some one tell him to go ahead and I will have a car when you come back. Q. Who told him that? A. I don't know who, whether it was Sweeney or August. . . . Q. You don't know whether it was Sweeney's or Quaas' voice? A. No. Q. You are not able to swear? A. I presume it was an inspector. Q. I am asking you what you are willing to swear to; are you willing to swear that it was either Quass or Sweeney or any other inspector at Howard and Riverside that gave that kind of an order? A. Yes, I believe I am. Q. Which one was it? A. Well, I think I

would swear it was Mr. Sweeney. Q. All right. Now, you saw Sweeney there then? A. I did not. Q. Didn't you see him? A. I just judged him from the voice. Q. What time of day was it? A. 7:38. . . . Q. When was it you saw this maneuvering by the motorman? A. When I stepped under the curtain. And I saw him push it around and when he pulled it the fire came out. That is as far as I can remember. Q. What did he do when he threw the reverse lever? A. He put on the current. He had the current off when I entered. .

"Q. At what speed was that car going when you were going through the car, for instance? A. I presume he had it checked to half speed when I was going through the car. Q. Well, now, had it been going on ten points anywhere from the park to the railroad? A. He fed it right up, right from where he picked up the last passenger. . . . Q. And he kept it at that full speed to where? A. I was inside. I could not tell you. I felt the car commence jerking. Q. From the school house, then, until you felt the jerking, the car was going full speed? A. Yes, sir. Q. On ten points? A. Until about 75 feet from the railroad. Q. You mean the car commenced to jerk when you were within 75 feet of the railroad? A. Yes, sir, commenced to catching and letting it go, like that, the wheels was sliding, or something. . . . A. I told you it was running about half speed. He got it checked at a half speed and after he seen he could not stop he fed it up full speed, which he was in the act of doing when I entered at his back. . Q. What would you say it was running, 15 or 20 miles an hour, or not? A. I would think they run about 30 miles an hour. Q. And at that rate of speed, within this 75 feet he had checked it one-half? A. No, I said he started to check the car in about 75 feet of the railroad. . . .

"Q. Now, on this occasion, had you or not paid any attention to the operation of the car and did you know anything about the condition of the brakes before you started on this end of the trip? A. After he reported it to the inspector, yes. Q. So you knew the brakes were out of order? A. I knew the brakes was not working. Q. So you knew exactly the condition of that car before you started on that last trip? A. Principally after it had started and I found how it worked. Q. And you knew before you started back from the end of the car line, the condition of those brakes, whatever that condition was? A. Yes, I found out they worked just about like they did when we reported it there at Howard and Riverside

when starting on that trip. Q. You had noticed when you heard him make this report at Howard and Riverside, you commenced to notice it? A. Yes, sir. Q. And you knew all about it before you got to the end of the car line, didn't you? A. I knew it was mighty hard to handle, and he could not stop whenever he wanted to exactly, that is within 10 or 15 feet. . . . Q. And you made all those stops all right, didn't you? A. Well, with the exception he had to throw off his current a good deal farther out that he did when his car was in perfect working order. Q. Well, he made the stops all right? A. Yes. He made some of them pretty close to the railroad I considered. Q. You knew that before you reached the end of the car line? A. Yes, sir. . . .

"Q. You say this current when on ten points is on at full speed? A. Yes, sir. Q. And it is impossible to run a street car any faster than the speed it is on when it is on the ten points? A. Unless it is on a high voltage. . . . Q. The car you had, car 87, it was at full speed when at ten points? A. Yes, sir. . . . Q. And it went full speed without making any stop until the car got within about seventy-five feet of the track? A. Yes, sir. Q. And then he started to stop it? A. Yes."

Appellant also testified that the car was one of the largest cars of the company, "one of those big, heavy, aisle cars," about thirty-seven feet in length. Here is a case where the motorman and conductor were both men of experience. They could judge the speed of the car; they knew where they were at all times; they knew the brakes of their car were not working right, and that the car frequently on that account ran by crossings where passengers required the car to stop; they knew they were coming to a steam railway crossing where they were required to stop the car and flag across such crossing. They ran this car at the rate of thirty miles per hour up to within seventy-five feet of the railroad crossing before attempting to stop. It would seem at least doubtful whether a heavy car, thirty-seven feet in length, traveling at the rate of thirty miles per hour, could be stopped at within twice its length. It certainly could not be stopped with any degree of comfort to its eleven passengers.

But if we assume that it could be stopped within that distance, it seems too clear for controversy that the motorman was guilty of wanton carelessness in maintaining such a rate of speed up to within seventy-five feet of the crossing, before attempting to stop, when he knew that the brakes of the car were out of repair. This great speed of the car was clearly the proximate cause of the accident. The motorman was inexcusable for maintaining such speed under such circumstances. It is claimed that the conductor was not responsible for the acts of the motorman. The evidence of the conductor himself was that it was the duty of the motorman to stop the car upon a signal from the conductor. The conductor knew where the car was. He knew the rate of speed at which the car was traveling, and he knew the condition of the car. The car was in his control, and he was as much responsible for the speed of the car as the motorman. But if he were not, he was a fellow servant with the motorman, and the company was not liable to him for the negligence of a fellow servant. *Grim v. Olympia Light & Power Co:*, 42 Wash. 119, 84 Pac. 635; *Berg v. Seattle, Renton & Southern R. Co.*, 44 Wash. 14, 87 Pac. 34, 120 Am. St. 968.

The evidence here shows that the negligence which caused the accident was that of the appellant and not of the company, and therefore the trial court properly dismissed the action. The order appealed from is therefore affirmed.

RUDKIN, C. J., and CROW, J., concur.

DUNBAR, J. (dissenting)—I dissent. I don't think the doctrine of fellow servant applies and the other question discussed was plainly for the jury.

PARKER, J., concurs with DUNBAR, J.