[No. 8936. Department One. November 30, 1910.]

M. B. HAGE, *Respondent*, v. FRANK W. LUEDINGHAUS *et al.*,
*Appellants*.[1]

MASTER AND SERVANT—NEGLIGENCE OF VICE PRINCIPAL—ORDERING
SERVANT INTO DANGEROUS PLACE—EVIDENCE—SUFFICIENCY. A signal-
man is not directly ordered by a vice principal to go into the bight
of a logging cable to give a second signal, where he was simply
signaled to start the engine, and could choose his place for giving
the signal.

MASTER AND SERVANT—INCOMPETENT FELLOW SERVANTS—EVIDENCE
—SUFFICIENCY. A "fireman" is not necessarily incompetent to run
a donkey engine, where no particular skill was required and it is
usual for either the engineer or the fireman to run it; and in the
absence of evidence of his incompetency, it is not negligence to
permit him to run the engine.

SAME. A single act of negligence is not sufficient to show that
a fellow servant was incompetent.

MASTER AND SERVANT—FELLOW SERVANTS. A man running a
donkey engine in a logging camp, and his signalman, are fellow
servants.

MASTER AND SERVANT—NEGLIGENCE OF MASTER—SAFE APPLIANCES
AND METHODS. Where it is not necessary for a signalman in a
logging camp to go into a dangerous place to give a signal by hand,
the master cannot be charged with negligence in failing to supply
a whistle wire to give the signals.

Appeal from a judgment of the superior court for Lewis
county, Rice, J., entered February 8, 1910, upon the verdict
of a jury rendered in favor of the plaintiff, in an action for
personal injuries sustained by an employee in a logging
camp. Reversed.

*James B. Murphy, Graves & Murphy*, and *C. H. Winders*,
for appellants.

*G. E. Hamaker*, for respondent.

PARKER, J.—This is an action to recover damages for per-
sonal injuries alleged to have resulted to the plaintiff from the

[1]Reported in 111 Pac. 1041.

negligence of the defendants while working for them as a chaser and signalman, in their logging operations in Lewis county. By his complaint, the plaintiff alleges negligence on the part of the defendants as follows:

"That on or about the 13th day of April, 1909, the plaintiff while engaged in his duty as a chaser in said crew as was customary was stationed by S. Hover, the hook-tender of said crew, and vice principal of defendants, at a point about 100 feet distant from the donkey engine, along and near the wire cables extending from the donkey engine, to a log attached thereto. That between the place where plaintiff was stationed as aforesaid and said wire cable, there was a large fir tree and it was the duty and custom acting under orders of said Hover, to take and receive orders and signals from said hook-tender S. Hover and then go to a place where plaintiff could be seen by the engineer and communicate the same to him, by means of waiving his hand; that the only place plaintiff could communicate the order and signals to the engineer was a place on the same side of the said tree that the wire cable was on, said place being a place attended with great danger of being injured by being struck with the wire cable when the donkey engine was started, and it was the duty and custom of the donkey engineer to take and receive the signals from plaintiff from said place, and then wait until plaintiff could go to the opposite side of the tree from where the cable was situated, a safe place, before starting the engine to draw a log in; that on said date the plaintiff in pursuance of his duty, and orders from said hook-tender, received a signal and order from said hook-tender and vice principal of defendants, who directed him to go on the same side of the said tree where said wire cable was situated and communicate the same to the engineer or person in charge of the donkey engine, said order or signal being to start the engine to draw in the log, and while plaintiff was in the act of carrying out his orders received as aforesaid, plaintiff was in the act and duty of raising his hand to signal the engineer, when the engineer, or person in charge of the engine, without waiting for plaintiff to go behind said tree, his said place of safety, and without warning, suddenly and violently started said donkey engine, causing the wire cable to swing violently, striking plaintiff's face, causing the loss of 13 teeth, breaking and causing the loss of 4 large

pieces of bones of the lower jaw, cutting and bruising his face, and permanently disfiguring plaintiff's face for life.

"That the person who was in charge of said donkey engine, and who was operating the same, when plaintiff was injured as aforesaid, was said fireman, who is known to plaintiff as Tom Powers and sometimes known as Tom Rouse, but whose true name is unknown to plaintiff, but is known to the defendants, that he was careless, negligent, and incompetent in the discharge of his duties as engineer, and he never had any experience as a donkey engineer, and was not an engineer at all, and that his carelessness, negligence and incompetency, was well known to the defendants, and the regular engineer, vice principal of the defendants, yet the said defendants, the said Sanders the regular engineer and vice principal of defendants, and the said Hover, hook-tender and vice principal of defendants, retained him in their employment and entrusted him with the duty of running, operating and handling said donkey engine, and taking and receiving orders and signals from plaintiff.

"That the carelessness, negligence and incompetency of said person in charge of said engine at the time the plaintiff was injured as aforesaid, was wholly unknown to plaintiff at that time.

"That it was the duty of the defendants to provide a reasonably safe place for the plaintiff to work, and the duty of reasonable inspection to see if that condition is preserved, and the duty to employ a competent engineer at all times to run and operate said donkey engine, all of which the defendants, their agents, servants and vice principals carelessly and negligently failed, neglected and omitted to do; and it was entirely owing to the carelessness and negligence of the defendants, their agents, servants and vice principals to provide a safe place for plaintiff to work, and reasonable inspection to see that that condition was preserved, and the negligence of said S. Hover hook-tender and vice principal, in directing and ordering plaintiff into the dangerous place where he was injured; and the carelessness and negligence of the defendants in employing a careless negligent and incompetent engineer to run and operate said donkey engine; and the carelessness, negligence and incompetency of said Tom Powers, sometimes known as Tom Rouse, whose true name is unknown to plaintiff, the person who was employed and allowed to run and operate said engine, in failing to give plaintiff time to reach

his aforesaid station of safety, and his suddenly and violently starting said engine without warning or in any manner allowing plaintiff to escape from said danger, that plaintiff was injured.

"That the danger attending plaintiff's obeying the order of said hook-tender, and going to said place to give said signal to the said person in charge of said engine, was not apparent to the plaintiff, and was not such as ordinary care and prudence on the part of plaintiff could have avoided."

By their answer the defendants deny the negligence charged against them and affirmatively plead contributory negligence and assumption of risk on the part of plaintiff, also that plaintiff's injuries, in so far as they resulted from the negligence of any one other than himself, were the result of the negligence of his fellow servant. A trial before the court and a jury resulted in a verdict and judgment for the plaintiff in the sum of $1,420.83, from which the defendants have appealed.

The principal contentions of learned counsel for appellants are that the trial court erred in denying their motion for a nonsuit at the close of respondent's evidence, and in denying their motion to withdraw the case from the consideration of the jury and for judgment in appellants' favor at the close of all of the evidence. These contentions call for an examination of the evidence touching respondent's allegations and contentions; (1) that he was ordered by the hook-tender into a dangerous place; (2) that the appellants negligently employed an incompetent person to run the engine; (3) that the engine was negligently started by such incompetent person; and that all of these negligent acts concurring, caused the injury. Let us notice each of these in order, in the light of the evidence viewed most favorably to respondent's contentions.

Was respondent ordered into a dangerous place? Appellants were engaged in logging operations, and respondent, who was experienced in the work, had been employed by them several days as chaser and signalman. The crew with which

he was working was using a donkey engine and wire cable in the usual manner, engaged in drawing logs from the woods for loading upon cars. The crew was in immediate charge of a hook-tender, whom it may be conceded was vice principal and not a fellow servant of respondent. It was the duty of the respondent as signalman to be stationed at some convenient point between the hook-tender and the engine, and receive signals from the hook-tender and communicate them to the man in charge of the engine, thus directing the starting of the engine when the cable is attached to a log ready for moving it. The necessity of having such a signalman arises from the fact that the hook-tender, whose duties require him to be at the end of the cable, is usually out of view from the engine, as he was in this instance. The signalman is free to choose his own station, the only requirement being that he is expected to station himself so that he can readily communicate the signals from the hook-tender to the engine. At this time the respondent was communicating the signals by motions with his hands, which is one of the very common ways of such communication. It is more or less dangerous to be near the cable when the engine is pulling upon the cable, especially when starting to pull upon it, as it is liable to swing with great force to one side or the other or upward. This was well known to respondent.

On the day respondent was injured, the crew in which he was working had commenced to operate at a new place, the road for the logs being cleared, only a few logs having been hauled over it. The cable was extended out from the engine about 200 feet, and was attached to a log by the hook-tender at a point out of view from the engine. Respondent was stationed at a convenient place for communicating the signal to start, and received and communicated such signal. He says he received and communicated this signal to start the engine, while standing upon a log near the engine. It is not claimed that this was a dangerous place. For some cause the engineer did not start promptly upon the giving of

this signal. The hook-tender then moved from his position so that respondent could not see him. Respondent then passed over the cable and stood behind a large tree where he could see the hook-tender, where he soon received another signal to go ahead from the hook-tender, the engine not having yet started. Respondent then stepped out from behind the tree near the cable to give the man at the engine another signal, and while his hands were up for the purpose of attracting the attention of the man at the engine, the engine started, and the cable swung and struck respondent. Respondent does not seem to know the immediate cause of the cable swinging, but another witness says the cable caught in a root upon the ground, which gave way upon the tightening of the cable. Respondent says that the man at the engine did not look up when he gave the second signal. It is apparent that the engine started in response to the first signal, after some delay, and without the man at the engine seeing the second signal. Respondent claims his purpose was to give the second signal and then get back behind the tree away from the cable before the engine started. He claims it was customary for the man at the engine to wait until the signalman got away from the cable before starting the engine whenever a signal was given from a point near the cable. As to the necessity of respondent's going near the cable to give the signal, the following is substantially all the information he gives us on that subject:

"Q. You may state whether or not there was any other place where you could go and take and receive signals from the hook-tender and communicate them to the engineer that it could be done properly. A. Why, I made a couple of attempts to get up on the other side of the line. But I was not accustomed to running on that side. As I stated I made a couple of attempts to get up there but the brush and one thing and another checked me. I did not take any further view of the positions around there after that. Q. Then Mr. Hage where you were standing at the time you gave that signal looked like a reasonably safe place to you? A. Yes,

sir. Q. And you did not anticipate that the line was going to hurt you. A. No, sir. Q. Now, if you had anticipated that that was a dangerous place, you would not have gone there? A. No, sir. Q. You would have gone somewhere else? A. I would have waited. Q. You would have gone somewhere else where you could have been seen or gone on high land? A. I would have waited or went around. Q. There was other places that was not an impossibility? There might have been other places? A. It was not impossible that I could not have gone some other place in that neighborhood, but I would have had to have been on that particular ridge."

Touching this matter, one of respondent's witnesses testified as follows upon cross-examination:

"Q. Could he have given the signals from anywhere about that? A. He could have given the signals from any point that he could have been seen from the donkey engine. Q. Could he have been seen from any other position? A. He certainly could. Q. Isn't it a fact that there was two or three acres where he might have been seen and from where he could have given the signals? A. Well, I do not like to say that there was that much ground. Q. Well, how much? A. The fact is that he could have stood anywhere he could hear the hook tender give the call and be seen by the donkey driver; at any point that he could hear the signal as it came from the woods and transmit it properly to the donkey driver. Q. Was there any other place a safe distance from the line where he might have stood and given signals? A. Yes, sir. Q. And might have stood and heard the hook-tender? A. Yes, sir."

There is practically no other evidence upon this subject. Respondent's story is somewhat involved touching the question of being ordered into a dangerous place by the hook-tender, but we are unable to give it a version more favorable to his contention than this summary. The contention seems to be, not that the hook-tender directly ordered him into a dangerous place but that the facts we have summarized above show that the hook-tender's signals given at the time, under these circumstances resulted in the respondent going into a dangerous place. Conceding that the facts occurred as

claimed by respondent, it seems to us quite clear that this was not ordering him into a dangerous place to give the signal to the man at the engine. Respondent was still free to give the signal from any convenient place he might choose, and he does not state or show by other witnesses that it was necessary to give the signal from this place. It also appears that he was well aware of the dangers of the cable, generally.

Some contention is made that the evidence shows that the position of the cable had been changed just before the accident, at a point between respondent and the log to which it was attached, in such manner as to render it more liable to swing towards where he gave the signal, and that this change was unknown to him. None of the evidence offered in behalf of the respondent shows any such change. The contention is based upon the testimony of the hook-tender, offered by appellants after respondent's case was rested, to the effect that the cable was in a different position than that testified to by the respondent. They simply differ as to the location of the cable. Nor is there any evidence that respondent did not have every opportunity to know of the position of the cable. Indeed, his duties were such as to give him good opportunity to be informed as to its location. We are of the opinion that, taking all of these facts as they are claimed to have existed by respondent, they fall far short of being sufficient to support a conclusion that he was ordered into a dangerous place.

Did appellants negligently employ an inexperienced man to run the engine? The evidence shows without conflict that the engine was run by the fireman as well as the engineer, sometimes by one and sometimes by the other; that it did not take an experienced engineer to run this kind of an engine; that a man may be a competent "donkey driver", as they are called, without being an engineer; and that this fireman could properly handle the engine as a donkey driver. There is no evidence of his lack of ability or incompetency in this regard except such as might be inferred from the manner in which he started the engine at the particular time respondent was in-

jured. This is not sufficient to support a conclusion that the appellant was negligently employing an incompetent donkey driver. The alleged incompetency was based upon nothing more than the single act of negligence, conceding it was such, occurring at the time of the injury. *Long v. McCabe & Hamilton*, 52 Wash. 422, 100 Pac. 1016; 8 Ency. of Evidence, 533-535.

Some courts seem to hold that the act of the fellow servant resulting in the injury may be of such a flagrant character that only an unfit servant could have committed it. But we are not here dealing with any such flagrantly careless act. It is unnecessary here to express any opinion as to the soundness of this doctrine. It is noticed in 1 Labatt, Master and Servant, § 189. It is clear there was not sufficient evidence to support a finding that appellants were negligent in employing this fireman and permitting him to run the engine.

We need not express any opinion upon the question of the fireman's alleged negligence in starting the engine. He and respondent were fellow servants, and therefore the appellants, under the previous holding of this court, were not liable for this alleged negligence of the fireman. *Millet v: Puget Sound Iron & Steel Works*, 37 Wash. 438, 79 Pac. 980; *Stevick v. Northern Pac. R. Co.*, 39 Wash. 501, 81 Pac. 999; *Grim v. Olympia Light & Power Co.*, 42 Wash. 119, 84 Pac. 635; *Berg v. Seattle, Renton & Southern R. Co.*, 44 Wash. 14, 87 Pac. 39, 120 Am. St. 968; *Taylor v. Washington Mill Co.*, 50 Wash. 306, 97 Pac. 243; *Jock v. Columbia & Puget Sound R. Co.*, 53 Wash. 437, 102 Pac. 405.

Learned counsel for respondent call our attention to *Conine v. Olympia Logging Co.*, 42 Wash. 50, 84 Pac. 407, and *Westerland v. Rothschild*, 53 Wash. 626, 102 Pac. 765, in support of his contention that appellants would be responsible for the negligence of the fireman in starting the engine. A critical examination of those cases, however, will show

that there was concurring negligence of the master in failing to cause the signal to be properly communicated; the injured servant being entirely beyond the view of the man at the engine, and having to depend upon such means of communication as the master furnished. In this case, the respondent, as signalman, was in direct communication with the man at the engine, using a very common method for such communication.

It is contended that appellants were negligent in not furnishing respondent with a whistle wire for signal purposes— that is, a wire attached to the engine whistle and running out to where respondent was stationed, so that he could give signals at a safe place away from the cable. It seems to us that even though we assume that there may sometimes be conditions where the furnishing of such wire would lessen the dangers to the signalman, it is not shown here that it was necessary to go into a dangerous place to give the signals by hand, which it is plain was a very common method of signaling.

We cannot escape the conclusion that the evidence here relied upon by respondent is wholly insufficient to support the verdict and judgment. We have dealt with the facts as though undisputed, in the most favorable light possible to respondent's contention. It follows that the learned trial court was in error in refusing to withdraw the case from the jury and enter judgment for appellants at the close of all the evidence.

The judgment is reversed, with directions to enter judgment for appellants in compliance with their motion.

Rudkin, C. J., Fullerton, Gose, and Mount, JJ., concur.