[No. 10697.  Department Two.  December 7, 1912.]

## O. T. LARSON, *Respondent*, v. G. J. KIEBURTZ *et al.,* *Appellants.*[1]

MASTER AND SERVANT—INJURIES TO SERVANT—ASSUMPTION OF RISKS—ASSUMING DANGEROUS POSITION.  A tramway repairer assumes the risks where, for his own convenience, he rode on a loaded car not intended for passengers or employees to ride on; and he therefore cannot recover although the jury found that the engineer was negligent in the operation of the engine, his acts only endangering property and in no way affecting the safety of any place provided for employees to work.

SAME—FELLOW SERVANTS—ENGINEER AND TRACK WORKER ON TRAMWAY.  An engineer operating a tramway engine and a tramway repairer, whose duty frequently took him to the engine house where he had every opportunity to observe the engineer in his work, are fellow servants, in regard to work in which the repairer was not under the control of the engineer, and with respect to matters not affecting the safety of the working place.

FULLERTON, J., dissents.

Appeal from a judgment of the superior court for King county, Myers, J., entered May 8, 1912, upon the verdict of a jury rendered in favor of the plaintiff, for personal injuries sustained by an employee on a tramway.  Reversed.

*Preston & Thorgrimson* and *Peters & Powell*, for appellants.

*Edward Judd* and *George A. Clark,* for respondent.

MORRIS, J.—In September, 1911, appellants were engaged in the construction of a reservoir at Seattle, and respondent was in their employ.  This reservoir was being constructed on Beacon hill some distance south of the city, and in order to best assemble the material used in the construction, appellants built a tramway from tide water to the reservoir site.  This tramway was about a half mile in length.  Its eastern end was at an elevation of three hundred and eighteen

[1]Reported in 128 Pac. 216.

feet. At this end was an engine which operated a cable, to which two tramcars were connected in such a manner that, when one car was at the eastern end, the other would be at the western end. These cars ran upon a single track and passed each other on a switch midway between the termini of the track. The cable ran around a drum at the eastern end and a sheave wheel at the western end. At the point where the switch was located, the track ran for a short distance upon a hill, having an elevation of about 150 feet. Between this hill and the eastern end there was a hollow or depression. The loaded cars coming up the hill would be first seen by the engineer controlling the movement of the cable when they reached the location of the switch upon the first hill. After passing over the switch and proceeding a short distance, the cars and track dropped about one hundred feet into the hollow between the switch and the engine house, passing out of the engineer's view, until they reached the second hill at the reservoir site. The engineer could tell the location of the ascending car by the pull on the cable, and was thus enabled to control its speed when rounding the hill for the switch and dropping down into the hollow. To hold the cable in place, sheave wheels were placed along the track at intervals. The switch was so constructed that the ascending car would take the north track and the descending car the south track. The flanges of the car wheels would push over the inside rails at the switch as they passed over, and the rails would remain in that position until the car would strike them on its return, so that each car as it passed the switch points would set them in proper position for its return trip. In this way the ascending car always took the north track.

Respondent had been in appellants' employ since the previous March. His work was to go over the track, see that it was in proper shape, making necessary repairs if he could, and if not, report the need to appellants. It was also his duty to oil the sheave wheels, the rollers and switch points,

and see that everything connected with the track was in good working order. On September 2, respondent reached his work about seven a. m., and starting at the west end of the track, walked along and upon the track to the eastern end, oiling the sheaves and rollers as he went along. He reached the engine house about 8:15 a. m., where he found the engineer and fireman. He remained here a short time, when he was requested by the fireman to get him a bottle of whiskey. He then went down the tramway to the western end, intending also, as he testifies, to get a wooden cleat and some nails and fix a roller he had discovered on his up trip needed repairing. This roller was in the hollow between the switch and the engine house. Arriving at the lower end, he went to a saloon, purchased the whiskey, obtained the wooden cleat and the nails, and got on a loaded car which was about to ascend the hill. These cars were not intended for any sort of passenger service, and Smith, one of the appellants, testifies that on two occasions he had expressly warned respondent against riding on them because of the danger. This is denied by respondent. There is also evidence to the effect that the employees in going up and down the hill were warned against riding on the cars; also evidence that, irrespective of this warning, they frequently rode in both directions. Placing his bottle of whiskey and the cleat upon the loaded car, with the nails in his pocket, respondent got on the front end of the car, with his back to the direction in which the car would move, standing on a large wire cable attached to the car for the purpose of connecting it with other cars, and leaning against the body of the car and holding on with hands, started up the incline. When the car came to the switch, instead of taking the north track as it should, the car took the south track. Respondent, with his back to the direction in which he was going, could not see this, and was not aware that anything was wrong until, as he says, he felt the jerking of the car, when he looked around and, as alleged in his complaint, seeing that the cable was

thrown out of place and assuming something would break and create a dangerous situation, he jumped from the car and was struck by the cable, suffering the injuries complained of. In his testimony he says, when he felt the car jerking, he looked around and just then a roller broke loose from the north track and hit him on his left knee, and knocked him off the car in between the cables on the north side of the car, and that he was caught up by the cables and thrown about fifteen feet to the north of the track.

There are numerous charges of negligence in the complaint, but in view of the answers of the jury to special interrogatories submitted to them, only one need be referred to, and that is that the jerking of the car "was caused by the careless, incompetent and negligent manner in which the engine in the power house was handled," coupled with an allegation that the engineer then in charge of the engine was incompetent. In returning a general verdict in respondent's favor, the jury, in answering the special interrogatories, found that the negligence of the appellants causing the injury was in the employment of "an incompetent engineer," who "was incompetent in respect to not giving his entire attention to the handling of the engine when the cars in question were approaching to and entering the switches on the day of the accident," and in "not checking sufficiently the velocity of the cars upon their advent at the switch." Appellants in appealing allege a number of errors, but we think the case must be disposed of in reviewing but one of them, and that is, Did the trial court err in denying the motion for judgment notwithstanding the general verdict?

At the time of the accident, there were three men in the engine house, Stead the engineer, Jackson the fireman, and Hargreaves an inspector for the city. Respondent produced Jackson and Hargreaves to describe the conduct of the engineer at the time, and appellants produced Stead in their behalf. Jackson says that Stead and Hargreaves were

engaged in conversation, Stead looking towards the south; that his first intimation that there was anything wrong was the stopping of the engine. Stead then tried to move the engine by reversing it in order to ascertain if a car was off the track, which effort failed and he then started down to ascertain the trouble. Hargreaves says that, as the cars approached the switch, Stead slowed up the engine, and the engine suddenly stopped as though it had been thrown to a dead center; that the engineer was startled and threw on the brake, and then released it and attempted to start the engine, but it refused to turn over, and he then set the brakes. The engineer says he slowed up the engine as the cars approached the switch, when he felt a jerk of the cable and immediately stopped the engine, and telling Hargreaves "there is something wrong," started the fireman down the track. The only testimony in the case, therefore, is that the engine was slowed up as it approached the switch.

Assuming, however, since the jury have so found, that the engineer was not giving his entire attention to the engine as the cars approached the switch, and that he did not sufficiently check the cars as they entered the switch, it would establish the fact that, in failing so to do, he acted carelessly and negligently; and while his careless and negligent acts in these respects might have endangered the property of his employers, there was nothing to indicate that they were in any manner affecting the safety of any place in which respondent or other employees might be working. Respondent had no duty to perform which necessitated his riding upon this car. There is nothing in this case from which it can be held that it was the duty of the engineer to handle his engine for the purpose of protecting the safety of employees upon the car upon this trip. If respondent chose to get upon this car, it was his voluntary act, for his own convenience, and not in the discharge of any duty imposed upon him by appellants. These cars were not intended nor provided for employees to ride upon. If they

choose to do so, they must assume in so doing responsibility for their own safety. The law imposes upon the master the duty to furnish the servant with a reasonably safe place in which to do his work and, as is said in *Westerlund v. Rothschild*, 53 Wash. 626, 102 Pac. 765, this duty is not confined alone to the place where the work is in progress, but extends to all the instrumentalities and appliances which, from the nature of the work, directly affect its safety. This rule, however, does not cover such a case as this, where the servant is unnecessarily making use of an instrumentality for his own convenience, to save himself the labor of climbing this hill; and when he does so, he becomes his own insurer, and assumes the risk of his act. The fact that other workmen did the same thing does not change the situation.

There is another legal barrier to any recovery by respondent. He and Stead were fellow servants under all testing rules. Stead was in no manner or degree respondent's vice principal, neither in the character of his work nor under any authority conferred by the common master. Respondent's duty was to inspect the tramway, keep it in proper repair, report needed repairs, oil the wheels and rollers, and other duties of a like nature, none of which took him upon the tramcars or necessitated his presence there. In the performance of this duty, he was frequently at the engine house when cars were ascending and descending, and had every opportunity to observe the attention Stead gave to his work and his manner of performing it. It might be presumed he paid no attention to Stead, because he knew that, so long as he kept within the path appellant had marked out for him to follow, Stead's care or lack of it would in no wise affect him. We have recently held, in *Lackey v. Big Creek Lumber Co.*, 70 Wash. 619, 127 Pac. 190, that, under the facts there developed, an engineer and fireman in the same engine room were not fellow servants; but that because of the fact that the fireman was un-

der the superintendence and control of the engineer and subject to his order and direction while performing his work, the engineer would be a vice principal. We have no such facts developed here, nor anything upon which any assumption of them might be founded. While we have no case where persons standing in the identical position to each other as is here shown have been held to be fellow servants, the following cases from this court announce rules and declare relations that are applicable: *Hughes v. Oregon Imp. Co.*, 20 Wash. 294, 55 Pac. 119; *Hart v. Cascade Timber Co.*, 39 Wash. 279, 81 Pac. 738; *Larsen v. Covington Lumber Co.*, 53 Wash. 146, 101 Pac. 717; *Hale v. Crown Columbia Pulp & Paper Co.*, 56 Wash. 236, 105 Pac. 480; *Hage v. Luedinghaus*, 60 Wash. 680, 111 Pac. 1041.

In *White v. Kennon*, 83 Ga. 343, 9 S. E. 1082, the engineer on a tramroad and a track-repairer were held to be fellow servants, a similar situation to that here disclosed. In Labatt on Master and Servant, § 498, note d *et seq.*, many similar illustrations are given where the relation of fellow servants has been sustained.

For these reasons, we are of the opinion that the motion for judgment should have been sustained. The judgment is reversed and the cause remanded with instructions to dismiss the action.

MOUNT, C. J., ELLIS, and MAIN, JJ., concur.

FULLERTON, J., dissents.